## 32732. REDD v. THE STATE.

HALL, Justice.

This is a death case presenting challenges to a warrantless automobile search; to certain medical evidence; and to sentencing procedures. We affirm Redd's convictions but reverse the death sentence for murder and require resentencing.

Redd was convicted of the January 26, 1976 kidnapping and murder of Paul D. Eskew, Sr. He was sentenced to death for the murder, and to life imprisonment for the kidnapping. The state's chief witness was John Morris, a 17-year-old male of borderline intelligence. Morris recounted at trial that he was with Redd when they both followed Eskew from a bar, blocked his attempted exit in his automobile, dragged him to Redd's automobile and drove him to the woods where Redd took his wallet and killed him by beating him with a tire tool and hammer, and slashing his throat twice. Redd then undressed the body and slashed the buttocks. The victim's clothes and the tire tool and hammer were disposed of, as was the victim's wallet, and both men washed the blood from the seat of Redd's automobile.

On February 2, 1976, Redd was arrested, and thereafter his automobile was found behind a poolroom in Waynesboro and was impounded by Investigator Warren Martin, who noticed bloodstains on the back seat. Martin had the car removed to the Richmond County jail where it was searched without a warrant. Portions of the stained seat cover and underlying material were chemically tested and found to contain type B human blood, Eskew's blood group. Redd's blood was shown to be type O.

Eskew's decomposed body was found months later in a grave in the woods, and was identified by a blue band on the right wrist and x-rays of the legs which showed the same old fracture lines shown in Eskew's medical records.

1. Redd first challenges the search of his automobile, arguing that it was invalid because not incident to arrest and done without a warrant.

Officer Martin discovered the bloodstains by flashlight. The use of a flashlight to see what would otherwise be in "plain view" falls within the "plain view" standard. United States v. Lee, 274 U. S. 559, 563 (1927). The bloodstains in plain view on the back seat of defendant's automobile following his arrest in a different location gave officers probable cause to search the car at that point, and we find exigent circumstances authorizing a warrantless search inherent in the surrounding facts even though the car was parked when officers found it. Carlton v. Estelle, 480 F2d 759, 763 (5th Cir. 1973). Therefore, this search might have been made either on the scene or at the station house without procuring a warrant. "In Chambers v. Maroney we held that police officers with probable cause to search an automobile on the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant. There, as here, '[t]he probable cause factor' that developed at the scene 'still obtained at the station house.'" Texas v. White, 423 U. S. 67, 68 (1975).

A warrant does not have to be obtained just because an automobile might be immobilized and watched until one is obtained. Chambers v. Maroney, 399 U. S. 42, 52 (1970). This search was proper. Accord, *Newman v. State,* 237 Ga. 376, 379 (228 SE2d 790) (1976).

The first four enumerations of error are without merit.

2. Enumerations 5 and 6 attacking portions of the testimony of the state's forensic chemist concerning bloodstains on state's Exhibits 12 and 13 are without merit. "Georgia law (Code § 38-1710) provides for the admission of opinions of experts on any question of science, skill, trade, or like questions. It is a matter within the sound discretion of the trial judge as to whether a witness has such learning and experience in a particular art, science or profession as to entitle him to be deemed prima facie an expert. *Glover v. State,* 129 Ga. 717 (9) (59 SE 816) (1907); *Merrill v. State,* 130 Ga. App. 745 (5) (204 SE2d 632) (1974)." *Barrow v. State,* 235 Ga. 635, 639 (221 SE2d 416) (1975).

The state's forensic chemist was permitted to testify as an expert. In determining that the human blood found on the back seat of Redd's automobile was international blood group B and that the victim's blood group was B, the chemist explained that he used for comparison control samples of stains he had already tested and grouped. This testimony is not invalid, as alleged, on the ground that there is no "proof" that his control samples were correctly grouped. The chemist felt confident of his controls and nothing casts doubt on them. The objection, if allowed, could quickly bog down such expert testimony in an endless process of "proving" the identity of all reagents, controls and chemicals used; and then "proving," perhaps, the accuracy of measuring devices, etc. This is contrary to the purpose of opinion testimony in scientific matters.

Similarly, the trial court did not abuse its discretion in allowing the chemist to testify that only 12 or 14 percent of the population has international blood group B. This is reasonably within his area of expertise. Cf. *Bowden v. State,* 239 Ga. 821, 826 (238 SE2d 905) (1977) (fingerprint expert allowed to testify on temperature and evaporation).

3. In Enumeration 7, Redd attacks the state's Exhibit 14 which was a document from University Hospital stating Redd's blood group to be O. This was admitted pursuant to the medical records statute (Code

Ann. § 38-713), referring to medical records of an "institution" as defined in Code § 88-1901 (a). Code § 38-712 (b). Code § 88-1901 (a) requires in pertinent part that an "institution" must be shown to be a building with two or more beds for medical patients *and* must have a certain classification by the Department of Health. Redd's counsel repeatedly objected in general terms that Exhibit 14 did not comply with the statute, in response to which the state introduced testimony of Dr. Howard of the State Crime Laboratory that it operated as a hospital and had numerous beds, etc. The evidence was then admitted. On appeal, for the very first time Redd alludes to the second part of the "institution" definition and claims Exhibit 14 is inadmissible because University Hospital was not shown to have the appropriate classification from the Department of Health.

Had the state been warned at first that Redd insisted upon this formal showing, steps might have been taken to procure the required proof; but the objection was never specifically made on this ground at trial. Redd does not claim even now that University Hospital lacks the hospital classification. Accordingly, considering the highly technical nature of the objection to the evidence, we will not allow it to be raised now, since a contrary ruling would allow Redd to sandbag the prosecution. His further objection here that the custodian's certificate was technically defective was also waived because not made at trial.

4. Enumeration 8 asserts error in the court's response to a question from the jury after they had begun deliberation, concerning their involvement in sentencing. The court replied: "Well, that is a matter that does not come up for the jury's consideration at this stage of the trial. You are concerned at the present time with a finding of guilty or not guilty of the charges in the indictment." This answer did not improperly imply, as Redd alleges, that the jury would find him guilty and sentence him later. Nor was it necessary to instruct the jury on the completely obvious proposition that they could sentence him *only* if they found him guilty.

5. Enumeration 13 is totally unspecific and is supported neither by argument nor by citation of

authority. Accordingly, it is deemed abandoned under Rule 18 (c) (2) of this court.

6. Enumeration 14 attacks the admission into evidence of certain x-rays of the victim on the ground that it was never proved of whom the x-rays were taken.

Redd's basic claim here appears to be that the name labels on the x-rays are not sufficient without additional supporting testimony to show the person of whom they were taken, namely, Paul D. Eskew, and that the victim's identification is thus not shown. The state offered the x-rays under Code Ann. § 38-711, the business records statute, and successfully showed that all were made and kept in the ordinary course of business. At our request, the trial court has forwarded the actual x-ray exhibits for our examination. They contain, as an intrinsic part of the x-ray picture, labels including the following information: Exhibits 17, 18 and 19 — Fort Gordon Army Hospital, Paul D. Eskew; Exhibits 20 through 24 — University Hospital, Paul Eskew. All the x-rays, including those taken of the exhumed body, were identified by expert opinion as x-rays of the same person.

The last sentence of Code Ann. § 38-711 states that "This section shall be liberally interpreted and applied." We see no reason why the name appearing on a record falling within the ambit of the statute should be thought not to be a part of the admissible record, and Redd does not support his argument on this point with any authority. We conclude that the x-rays were properly admitted.

7. The jury sentenced Redd to death after finding him guilty of murder in the course of kidnapping with bodily harm to the victim, which is an aggravating circumstance authorizing the ultimate penalty under Code Ann. § 27-2534.1 (b) (2). In Enumeration 10 Redd argues correctly that his death sentence must be set aside for failure of the trial court to make clear to the jury in his charge taken as a whole that they might in their discretion recommend a life sentence even if they found the existence of a statutory aggravating circumstance. *Hawes v. State,* 240 Ga. 327 (1977); *Fleming v. State,* 240 Ga. 142 (1977). The lack of clarity in the charge was raised below by specific objection by Redd's attorney, but no re-charge was made. Accordingly, the death sentence

must be overturned and Redd must be resentenced, which also has the effect of mooting Enumerations 9, 11 and 12 which attack other aspects of the sentencing procedure.

Redd's conviction and life sentence for kidnapping are affirmed. His murder conviction is affirmed, but the sentence is set aside and a new trial is ordered on the issue of punishment for that offense.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Jordan, J., who dissents.*

ARGUED SEPTEMBER 20, 1977 — DECIDED FEBRUARY 21, 1978.

*Pierce & House, Stanley C. House,* for appellant.
*Richard Allen, District Attorney, Arthur K. Bolton, Attorney General, Daryl A. Robinson, Staff Assistant Attorney General,* for appellee.

JORDAN, Justice, dissenting.

I dissent to Division 7 of the opinion in which the death sentence is set aside and a new trial ordered as to punishment. In my opinion the charge taken as a whole meets the requirement of the law.

On the punishment phase of the trial, the court charged the jury to "consider all of the evidence received by you in open court, in both phases of the trial. You are authorized to consider all the facts and circumstances of the case." The charge made it clear that the crimes for which the defendant had been found guilty were punishable by death *or* life, and that it was their duty to determine the penalty within the established limits. The court further correctly charged that "before you would be authorized to find a verdict fixing a sentence of death . . ., you must find evidence of statutory aggravating circumstances . . ."

In my opinion this charge made it quite clear that the jury could consider all of the facts and circumstances of the case, including evidence in mitigation and aggravation, in order to arrive at the proper penalty and that they were authorized to fix the punishment at *either* death or life. The charge on aggravating circumstances did not mandate a sentence of death if such was found, but

merely *authorized* the death penalty.

I think the jury fully understood its duties and prerogatives under the charge as given. I would affirm.