A98A0514. IN THE INTEREST OF C. W. D. et al., children.
(501 SE2d 232)

ELDRIDGE, Judge.

This appeal was taken by the mother of three minor children, C. W. D., T. A. D., and C. D. H., after the Juvenile Court of Butts County entered an order terminating her parental rights, as well as the parental rights of the fathers, on September 25, 1997.

On November 1, 1994, the mother was arrested by the Butts County Sheriff's Department; the Georgia Department of Human Resources, acting through the Butts County Department of Family & Children Services ("DFCS"), then became involved when called by the Sheriff's Department about the children. When taken into custody, the children appeared physically dirty, had dirty clothes, and smelled of urine and body odor. The mother gave the DFCS caseworker several false names, as did the children. Because the mother prevented the correct identification of herself and her children and refused to give the names and addresses of relatives willing to take the children, a safekeeping order for the children was obtained on that date from the juvenile court. The mother finally provided the names of several relatives, but they were unwilling to take the children. The mother also reluctantly provided the identities of the putative fathers; none of the fathers made any effort to contact, support, or reunite with the children. The children have remained in the custody of DFCS since November 1, 1994.

While the mother was held in the Putnam County Jail, DFCS took the children to visit with their mother, but the children shrieked, cried, and acted fearful of their mother.

On April 5, 1995, the mother and DFCS developed a plan of unification with the following goals: (1) that the children would have a safe and stable home; (2) that the children's educational, psychological, medical, and dental needs would be met; (3) that the mother would cooperate with DFCS; and (4) that the mother would have positive communications with her children. The juvenile court adopted the case plan and ordered compliance on April 14, 1995.

When the plan was developed on April 5, 1995, the mother was incarcerated; she was not released from prison until the summer of 1995, when she moved to Coweta County. On October 3, 1995, a second reunification plan was developed that was virtually identical to the first plan. On October 11, 1995, the Juvenile Court of Butts County adopted the plan by order.

On November 12, 1995, the mother's home was investigated, but was not approved because the dwelling had too many hazards that put the children at risk. In November 1995, the mother agreed to pay child support but failed to do so in violation of a court order.

Between August 1995 and April 11, 1996, the mother visited the children approximately once a month. Several visits were scheduled, but the mother failed to appear. The visits with the children were strained, and the children expressed the wish not to visit with the mother.

On April 2, 1996, a third reunification plan was completed that was virtually identical to the prior plans. It was made the order of the court on April 10, 1996. The mother was arrested again for shoplifting and incarcerated on April 11, 1996. On October 9, 1996, the juvenile court issued an order that encompassed the prior provisions, but ordered that DFCS proceed toward termination of all parental rights. On October 21, 1996, the mother was tried, convicted, and sentenced to ten years imprisonment, four to serve with the balance probated. Subsequent to the mother's arrest on April 11, 1996, she remained in custody and made no further visits with the children.

Since April 1995, the mother failed to meet the goals of the plans and, as a result of her repeated incarcerations, was unable to provide a safe and secure home. She failed to pay child support. She failed to cooperate with DFCS in that she did not provide: (1) verification of her income; (2) the children's medical histories; (3) contact with DFCS after her incarceration in April 1996; and (4) the names of the putative fathers in a timely manner. The mother's communication with the children was either late, not made at all, or strained when made in person. Written communication was non-existent from April 11, 1996 until October 1996, and she failed to meet the goal of monthly communication.

The mother's care or lack thereof had a significant impact on the children. Dr. Barbara Toner, who holds a Ph.D. in clinical psychology, was qualified as an expert and testified as to the children's mental and emotional condition and the precipitating cause of their conditions. C. W. D. was diagnosed as having post traumatic stress syndrome, Tourette's syndrome, and attention deficit disorder. T. A. D. was diagnosed as suffering from post traumatic stress syndrome, as well as a possible obsessive-compulsive disorder. C. D. H. was diagnosed as experiencing post traumatic stress syndrome. Dr. Toner stated her expert opinion that the children's disorders were caused by physical, psychological, and emotional abuse by the mother. The children, under counseling and examination, told her of their fear of their mother because the mother beat them with extension cords, shoes, switches, and belts and had stepped on C. W. D.'s neck. The children have extremely negative memories of their mother and

sought to forget the painful past with her. It was Dr. Toner's opinion that the children would be unable to reestablish a relationship with their mother if they were reunited or visited by her.

C. W. D. and T. A. D. testified and were cross-examined via closed circuit television after the juvenile court judge determined that to do so in the presence of their mother would be detrimental to their mental health and emotional well-being. This decision was based upon the opinion of Dr. Toner. C. W. D. testified in detail as to the same abuse to which Dr. Toner had testified. C. W. D. stated that he did not want to return to his mother and would not object to adoption. T. A. D. also testified in detail about how he had been physically abused, as had been described by Dr. Toner in earlier testimony, and that, as a consequence, he did not want to return to his mother. He had no objection to adoption and did not want to have future contact with his mother.

Following this hearing, the juvenile court terminated the parental rights of the children's mother and fathers.

1. The first enumeration of error is that the trial court erred in finding clear and convincing evidence to support termination of the mother's parental rights. We do not agree.

There was clear and convincing evidence of deprivation of the children, and that the deprivation would continue in the future. The juvenile court went through the two-step process for termination correctly. OCGA § 15-11-81 (a); *In the Interest of A. M. V.*, 222 Ga. App. 528, 529 (474 SE2d 723) (1996); *In the Interest of A. T.*, 187 Ga. App. 299, 301 (370 SE2d 48) (1988).

The record, by clear and convincing evidence, shows that the children were deprived within the meaning of OCGA § 15-11-2; that the mother's lack of parental care and control of the children was the cause of the deprivation status; that the deprivation was likely to continue in the future and would not be remedied; and that such deprivation caused and was likely to further cause physical, mental, emotional, and moral harm to the children. OCGA § 15-11-81 (b) (4) (A) (i)-(iv); *In the Interest of D. T.*, 221 Ga. App. 328, 329 (471 SE2d 281) (1996); *In the Interest of G. K. J.*, 187 Ga. App. 443 (370 SE2d 490) (1988). Such factors show the existence of parental misconduct or the inability to remedy the causes of deprivation and support the juvenile court's finding that the termination of parental rights is in the best interests of the children. OCGA § 15-11-81 (a).

Since November 1, 1994, the mother had been unable to provide a safe and stable home for the children, either because she has been incarcerated or because the home had too many physical hazards for the safety of the children. This demonstrates that the children were deprived and were likely to be deprived in the future. See OCGA § 15-11-81 (b) (4) (A) (i), (iii); see also OCGA § 15-11-2.

The mother failed to contact or visit with the children from April 11, 1996, until September 25, 1997, the termination date, because she was incarcerated. Also, she had not maintained telephone or written communication with either the children or DFCS. Further, the children did not wish to have contact with their mother, because they were afraid of her due to her physical, psychological, and emotional abuse of them. Dr. Toner gave expert testimony that the emotional and psychological conditions from which the children suffered were caused by their mother's treatment of them and that a healthy relationship between them could not be restored. Thus, the mother's conduct satisfied the second criterion, because she caused the children's deprivation. See OCGA § 15-11-81 (b) (4) (A) (ii); see also OCGA § 15-11-81 (b) (4) (B) (iii), (iv), (v).

Since the mother had been without custody of the children from November 1, 1995 until September 25, 1997, within OCGA § 15-11-81 (b) (4) (A) (ii), then OCGA § 15-11-81 (b) (4) (C) empowered the juvenile court to determine whether the parent, without justifiable cause, failed for a period of one year or longer to significantly: (1) communicate with the children; (2) care for and support the children as required by judicial decree; and (3) comply with a court-ordered plan of reunification. See OCGA § 15-11-81 (b) (4) (C) (i)-(iii).

From November 1995 until March 1996, the mother visited with the children once a month only, but only because DFCS either took the children to see her where she was incarcerated or made the children available for visitation. Once the mother was incarcerated in April 1996, she failed to contact the children or even request DFCS to bring the children to see her where she was incarcerated. Although the mother was scheduled for two visits per month from April 11, 1996, until the termination on September 25, 1997, she made no visits or requested visits in prison with her children. At the time of the termination hearing on June 11, 1997, more than one year had passed without a visit or a request for a visit. Further, the mother had been asked to write the children at least once a month under the reunification plan while she was incarcerated, but she wrote only occasionally.

The mother agreed to pay and was ordered to pay child support, but she failed to do so between November 1, 1994 and June 11, 1997.

The mother failed to comply with any of the court-ordered reunification plans. OCGA § 15-11-81 (b) (4) (C) (iii). She never provided a safe and stable home; she never provided for the children's educational, psychological, medical, and dental needs; and she failed to support the children. The mother failed to cooperate with DFCS by providing verification of income and the children's educational and medical histories or to maintain contact with DFCS after her incarceration in April 1996. The mother only reluctantly furnished infor-

mation about relatives and the fathers.

Parental unfitness, caused either intentionally or unintentionally, which results in abuse or neglect or which is tantamount to physical or mental incapacity to care for the children will justify termination of parental rights. *In the Interest of T. R. L.*, 162 Ga. App. 659, 660 (292 SE2d 518) (1982).

"The past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue." (Citations and punctuation omitted.) *In the Interest of J. M. C.*, 201 Ga. App. 173, 174 (410 SE2d 368) (1991); *In the Interest of J. L. Y.*, 184 Ga. App. 254, 257 (361 SE2d 246) (1987); see *In the Interest of A. M. V.*, supra at 531; *In the Interest of B. P.*, 222 Ga. App. 621, 622 (475 SE2d 673) (1996); *In the Interest of A. M. B.*, 219 Ga. App. 133, 134 (464 SE2d 253) (1995). In this case, the children did not want to live with or even visit with their mother because of her past physical, psychological, and emotional treatment of them. Thus, the juvenile court could find that this conduct was likely to continue in the future. OCGA § 15-11-81 (b) (4) (A) (iii); *In the Interest of P. N. L.*, 228 Ga. App. 187 (491 SE2d 434) (1997); *In the Interest of J. M. C.*, supra at 174; see also OCGA § 15-11-81 (b) (4) (B) (v). The court must base its decision on more than positive promises of good behavior which the past has proven will not be carried out. See *In the Interest of R. N.*, 224 Ga. App. 202, 205 (480 SE2d 243) (1997); *In the Interest of D. I. W.*, 215 Ga. App. 644, 646 (451 SE2d 804) (1994). Rather than keep the children in foster care until they are 18, the court properly determined that termination of the parental rights and adoption were in the best interests of the children. OCGA § 15-11-81 (a); *In re G. M. N. & D. M. N.*, 183 Ga. App. 458, 461 (359 SE2d 217) (1987); *In the Interest of T. R. G.*, 162 Ga. App. 177 (290 SE2d 523) (1982). Therefore, this Court finds that the juvenile court had sufficient clear and convincing evidence to justify termination of the mother's parental rights.

2. The second enumeration of error is that the juvenile court erred in admitting hearsay evidence in the form of DFCS' Exhibits 1 through 5, i.e., the plans for reunification. We do not agree.

Each plan was made the order of the court. Therefore, as a copy of a record of judicial proceedings, the plans and orders were admissible as primary evidence. See OCGA § 24-5-31; *Bell v. Cone*, 208 Ga. 467 (67 SE2d 558) (1951); *Traylor v. Epps*, 11 Ga. App. 497 (75 SE 828) (1912). For practical reasons, the original pleadings and court records are not treated as the highest and best evidence and are not favored for admission in evidence, but certified copies are by statute deemed the highest and best evidence. Otherwise, court records would be used in other legal proceedings and would become part of the record in such cases, thereby destroying the integrity and com-

pleteness of the original court records. Thus, the original court records and certified copies have equal dignity, with the preference for certified copies. See *Mason v. State*, 197 Ga. App. 534 (398 SE2d 822) (1990); *Moody v. Bd. of Commrs. of Appling County*, 29 Ga. App. 21 (113 SE 103) (1922).

Further, the copies of court records do not come within the definition of hearsay because, if the foundation is laid as to identity, authenticity, relevancy, and materiality, then the copies of the court records are admissible as the highest and best evidence of what is contained therein. By definition, hearsay is evidence "which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." OCGA § 24-3-1 (a). Such copies of court records did not come within the hearsay rule applicable to the interpretation of the content of non-public records because the records were admitted into evidence. See *Glenridge Unit Owners Assn. v. Felton*, 183 Ga. App. 858 (360 SE2d 418) (1987); *Rodgers v. Cumberland Volkswagen*, 167 Ga. App. 826 (307 SE2d 721) (1983); *Foster v. Nat. Ideal Co.*, 119 Ga. App. 773 (168 SE2d 872) (1969). " 'A written statement made by a public official or under his supervision is admissible as evidence tending to prove the truth of the matter stated if he is required to make the statement by statute or by the nature of his duty. This exception to the rule excluding hearsay is recognized because of the inconvenience to the public of having the official leave his office to testify in court in person, and because of the circumstantial probability of trustworthiness arising from his official duty.' Green, Ga. Law of Evidence (2nd ed.), § 317." *United Waste, Ltd. v. Fulton County*, 184 Ga. App. 694, 695 (1) (362 SE2d 476) (1987). If the copies of the court records had not been introduced as evidence and a DFCS worker other than the maker of the record sought to testify as to the content of the plans, then the testimony as to the content, but not the records themselves, would be subject to objection as hearsay. *Lipscomb v. State*, 194 Ga. App. 657 (391 SE2d 773) (1990). Further, to the extent that the records contained admissions against the interest of the mother, such portions of the records would not be hearsay. See OCGA § 24-3-31; *United Waste, Ltd. v. Fulton County*, supra at 696; *Clark v. Toms*, 181 Ga. App. 557 (353 SE2d 54) (1987); *Mulherin v. Globe Oil Co.*, 173 Ga. App. 790, 791 (2) (328 SE2d 406) (1985).

Records made in the regular course of business and for which a proper foundation is provided are admissible outside the hearsay rule; such records include those made by public employees transacting their official duties. See OCGA § 24-3-14; *Robertson v. State*, 210 Ga. App. 834 (437 SE2d 816) (1993); *Munda v. State*, 172 Ga. App. 857 (324 SE2d 799) (1984); *Johnson v. State*, 168 Ga. App. 271 (308 SE2d 681) (1983).

3. The third enumeration is that the trial court erred in allowing a witness to testify as an expert without being qualified. We do not agree.

The basis of the mother's objection to the qualification of the expert witness was that she was not licensed in the State of Georgia as a psychologist and that she was not tendered as an expert witness until near the end of her testimony and after cross-examination.

(a) Dr. Toner testified that she was a psychologist and educator by education, training, and experience. She had a B.A. and an M.A. in education, as well as an M.A. and Ph.D. in clinical psychology. She was licensed as a psychologist in Vermont, although not by the State of Georgia.

An expert witness is anyone who, through training, education, skill, or experience, has peculiar knowledge that the average juror would not possess as to "any question of science, skill, trade, or like questions"; the expert witness may render an expert opinion within the witness' area of expertise after the qualifications have been proven to the trial court. See OCGA § 24-9-67; *Martin v. Baldwin*, 215 Ga. 293 (110 SE2d 344) (1959); *Macon R. &c. Co. v. Mason*, 123 Ga. 773 (51 SE 569) (1905); *Knudsen v. Duffee-Freeman, Inc.*, 95 Ga. App. 872 (99 SE2d 370) (1957); *Tifton Brick &c. Co. v. Meadow*, 92 Ga. App. 328 (88 SE2d 569) (1955).

It is for the trial court to determine, as a matter of law after hearing evidence, whether a witness is competent by way of qualifications to render an opinion within their area of expertise. *Redd v. State*, 240 Ga. 753 (243 SE2d 16) (1978); *Barrow v. State*, 235 Ga. 635 (221 SE2d 416) (1975); *Hicks v. State*, 196 Ga. App. 311 (396 SE2d 60) (1990). The requirements for qualification as an expert witness are minimal; generally, nothing more is required to qualify an expert than evidence that the person has been educated in a particular trade, science, or profession. *Watkins v. State*, 259 Ga. 648 (386 SE2d 132) (1989); *Brown v. State*, 245 Ga. 588 (266 SE2d 198) (1980); *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977); *Inta-Roto, Inc. v. Guest*, 160 Ga. App. 75 (286 SE2d 61) (1981). Formal education or training in an area of expertise is not necessary, provided the witness possesses the qualifications of such area of expertise through skill and experience. *Brown v. State*, supra. It is the possession of special knowledge derived either from experience, study, or both in a field of expertise that makes one an "expert." Id.; *Bowden v. State*, supra; *Southern R. Co. v. Cabe*, 109 Ga. App. 432 (136 SE2d 438) (1964). Thus, an expert witness can express an opinion on a matter which comes within the person's qualifications. *Martin v. Newton*, 129 Ga. App. 735 (201 SE2d 31) (1973).

The possession of a license in Georgia does not go to qualification as an expert witness but may go to the weight and credibility that a

jury gives to such expert's opinion. In this case, Dr. Toner was qualified by education, training, and experience and was accepted as an expert by the trial court when tendered as an expert witness.

(b) The tender of an expert witness after being qualified through the presentation of evidence of expertise is a different issue than presenting the evidence of qualification. By tender of the witness, the party is seeking a legal determination by the trial court that the witness has the requisite qualifications to be permitted to render an expert opinion. The tender of a witness as an expert witness has three purposes: (1) it indicates the capacity in which the witness will testify, if accepted, allowing the rendering of an expert opinion; (2) it provides the opposite party an opportunity to voir dire the witness prior to the trial court's determination whether or not the witness has the requisite qualifications to testify as an expert witness; and (3) it allows the trial court the opportunity to rule as a matter of law if the witness will be allowed to state an expert opinion. Since such determination is for the trial court alone and does not have to take place in the presence of the jury, then the trial court may make such determination at any time after tender. Tender may be made pretrial, either in a pre-trial order which names the witness as an expert or by oral tender.[1] Tender may be made during trial after hearing evidence, either in the presence of the jury, at a bench conference, or outside the presence of the jury.[2] Tender may be formal in oral announcement before the trial judge or before the jury.[3] Tender may be implied after the foundation for qualification has been laid and counsel has asked if the examination of the witness may proceed and is instructed by the trial court to proceed.[4] *Moss v. State*, 216 Ga. App. 711, 712 (2) (455 SE2d 411) (1995). If, after qualifying the witness as an expert but without formal tender, counsel proceeds to ask for expert opinion evidence, based upon either a hypothetical or facts within the personal knowledge of the witness, the trial court has tacitly or impliedly accepted the witness as an expert. Further, if the opposite party objects to the expert opinion and the trial court overrules the objection, then the court has impliedly accepted the witness

---

[1] Pre-trial evidence to determine qualifications of the expert may come from a curriculum vitae, stipulations of fact, testimony, or judicial notice where appropriate.

[2] Tender may be made to the trial court outside the presence of the jury because the court's determination of qualification may cause the jury to attach greater weight and credibility to an expert witness as a consequence. However, even if the trial court makes a determination of qualification outside the presence of the jury or the other party stipulates to the qualifications, counsel will want the jury to hear the qualifications for purpose of persuasion as to weight and credibility of the evidence. Therefore, no time is saved by such procedure.

[3] The trial court can make the determination of qualification on the record at a bench conference so that the evidence of qualification does not have to be presented twice.

[4] This is a method many trial judges employ to avoid announcing the acceptance of the expert witness in the presence of the jury.

as an expert. See *Stewart v. State*, 246 Ga. 70, 75 (4) (268 SE2d 906) (1980); *Lindley v. State*, 225 Ga. App. 338, 340 (484 SE2d 33) (1997); *Bacon v. State*, 225 Ga. App. 326, 327 (483 SE2d 894) (1997); *Newberry v. D. R. Horton, Inc.*, 215 Ga. App. 858 (1) (452 SE2d 560) (1994). A witness who is neither qualified as an expert nor tendered as such is not competent to render an expert opinion. *Stephens v. State*, 219 Ga. App. 881, 883 (1) (467 SE2d 201) (1996); see also *Davis v. State*, 209 Ga. App. 572, 573 (434 SE2d 132) (1993).

The danger in failing to make some overt act of tender of the expert for the record, orally or through pre-trial order, or to have the trial court rule on the record, is that, on appellate review, the cold record makes it impossible to determine whether or not the witness gave the opinion as a layperson or an expert. If the trial court accepted the witness as a qualified expert, then such acceptance may not be apparent on the record, unless the trial court overruled an objection to the expert opinion. *Stewart v. State*, supra. This evidentiary problem is illustrated in *Hudson v. Santangelo*, 228 Ga. App. 768, 771 (1), 773 (2) (492 SE2d 673) (1997). While the evidence showed that the plaintiff's witness was qualified through training and experience as an expert, he was neither tendered nor did he render an expert opinion. He merely stated that he would have done the construction differently. However, the defendant's expert testified that the work met the standard of the industry. Plaintiff's witness did not testify to establish the standard of care of the trade nor state that the acts or omissions of the defendant deviated from such standard; as such, the testimony did not contradict the defendant's expert. Therefore, the evidence was insufficient to show a breach of duty. From the record, it could not be reasonably inferred that the trial court tacitly or impliedly accepted the plaintiff's witness as an expert, because the witness rendered no expert opinion.

In this case, the expert witness was qualified at the inception of her testimony but not tendered orally as an expert until the end of her testimony; the trial court expressly ruled that she could properly render an expert opinion. The trial court did not err.

4. The next enumeration of error is that the trial court erred in admitting hearsay evidence. We do not agree.

The social worker testified that the children did not want to visit with their mother prior to their visit and then acted afraid and upset when they visited. This explains the children's mental state regarding their mother, as well as their conduct in her presence. Such evidence was relevant and material as to the present and future inability of the children to reestablish a relationship with their mother and to ascertain their best interests. See OCGA § 24-3-2; *Momon v. State*, 249 Ga. 865 (294 SE2d 482) (1982); *Noles v. State*, 172 Ga. App. 228 (322 SE2d 910) (1984).

The statements of the children to Dr. Toner about their mother's conduct, i.e., that their mother forced them to use false identities, and its effect on them psychologically went to the children's deprivation, as well as explained the children's conduct when taken into custody. The history that a patient gives to a psychologist during examination or treatment is not hearsay and is admissible as an exception to the hearsay rule. See OCGA § 24-3-4; *Southern R. Co. v. Lawson*, 256 Ga. 798 (353 SE2d 491) (1987); *Sinclair Oil Corp. v. Hendrix*, 119 Ga. App. 770, 771-772 (2) (168 SE2d 862) (1969).

5. The mother's last enumeration of error is that the trial court erred in denying her constitutional rights of confrontation. We do not agree.

While a parental termination proceeding is not a criminal proceeding implicating the Sixth Amendment right of confrontation of a witness testifying against the accused, such proceeding involves a fundamental liberty interest, so that "due process requires that we afford this liberty interest the same protection on appellate review that we afford those constitutionally protected interests in cases where a criminal conviction is had." *Blackburn v. Blackburn*, 249 Ga. 689, 693 (292 SE2d 821) (1982). While not recognizing a right of confrontation under the Sixth Amendment in termination cases, this Court has found a due process right to confront the witnesses, which is different from the protection afforded in criminal trials. See *In the Interest of M. S.*, 178 Ga. App. 380, 381 (343 SE2d 152) (1986); see also *In the Interest of B. G.*, 225 Ga. App. 492 (484 SE2d 293) (1997).

"[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Cit.]" *Mathews v. Eldridge*, 424 U. S. 319, 335 (96 SC 893, 47 LE2d 18) (1976). Here, the mother's due process rights were satisfied when balanced against the best interests of the children. A procedure was employed that reasonably accommodated everyone with minimal effect on the mother.

In both decisions of this Court, *In the Interest of B. G.*, supra at 493-494, and *In the Interest of M. S.*, supra at 381, the parents not only were excluded from the examination of the witness, but were deprived of the opportunity to effectively assist counsel, a situation which was not present in this case. "Any procedure which limits the party's ability to confront the child witness must also be tailored to protect the right of confrontation to the greatest extent possible.

[Cit.] As in *M. S.*, supra, the trial court erred by completely excluding the mother from the courtroom without a showing of necessity and without using procedures which would accommodate her ability to hear the testimony and consult with her attorney." *In the Interest of B. G.*, supra at 494.

In this case, the children were permitted to testify via closed circuit television so that the mother could hear the testimony, see the witness, and consult with her counsel. The juvenile court first heard from Dr. Toner regarding the psychological and emotional states of the children and the effect confrontation would have on them. Dr. Toner testified that the children were afraid of their mother and that their post traumatic stress syndrome could be worsened unless closed circuit television was used for their testimony. The juvenile court then decided, over the objection of counsel for the mother, to allow the closed circuit television examination.

While the juvenile court did not "make an evidentiary finding that the [children] would be substantially traumatized by the event and that the child's welfare compels a limitation on the party's right to confront the child witness," *In the Interest of B. G.*, supra at 494, the juvenile court, after hearing evidence to that effect, tacitly or implicitly adopted such evidence as the findings of fact of the court and ordered the closed circuit television examination over objection. See *Maryland v. Craig*, 497 U. S. 836, 851-852 (III) (110 SC 3157, 111 LE2d 666) (1990); *In the Matter of the Adoption of J. S. P. L.*, 532 NW2d 653, 660-661 (N.D. 1995); *In re Michael C.*, 557 A2d 1219, 1221 (R.I. 1989); *In the Interest of B. G.*, supra at 494. There was no violation of the mother's rights of due process as to confrontation.

*Judgment affirmed. Blackburn, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED MARCH 31, 1998 —
RECONSIDERATION DENIED APRIL 14, 1998 —

*Lindsey & Jacobs, Tamara Jacobs*, for appellant.

*Thurbert E. Baker, Attorney General, Jeffrey L. Milsteen, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Bush & Smith, Wilson H. Bush, Jenkins & Nelson, John C. Shelton, W. Ashley Hawkins*, for appellee.