## A07A0719. WOODLAND PARTNERS LIMITED PARTNERSHIP v. DEPARTMENT OF TRANSPORTATION.

(650 SE2d 277)

PHIPPS, Judge.

In 2002, in furtherance of a construction project to widen a highway, the Georgia Department of Transportation (DOT) acquired by condemnation 0.913 acre of an approximately 800-acre tract of unimproved land owned by Woodland Partners Limited Partnership.[1] At a jury trial, Woodland contested the DOT's estimation of just and adequate compensation. Dissatisfied with the judgment entered upon the jury's verdict, Woodland appeals to this court, challenging various evidentiary rulings. Because Woodland has failed to show that the trial court erred, we affirm.

The evidence showed that, for years, Woodland's 800-plus acreage had been under a mining permit, with about 300 acres having been used for actual mining. The 0.913 acre acquired by the DOT was outside such 300 acres and abutted the highway. Woodland's valuation expert witness described that parcel as "a strip of land that's about thirty feet deep and fifteen hundred and sixty feet long." The parties' valuation expert witnesses all agreed that the highest and best use of the property taken was for commercial development.

1. Woodland contends that the trial court erred in allowing testimony by Gary Hammond, a DOT expert witness.

(a) Woodland first argues that Hammond should not have been allowed to give his opinion as to just and adequate compensation because he was not "qualified as an expert in development." Whether a witness is qualified to give his opinion as an expert is a question for the trial court, which determination will not be disturbed absent

---

[1] OCGA § 32-3-1 et seq. The DOT also obtained a temporary easement for the right to construct a driveway to connect the newly constructed road to the Woodland's remaining land.

manifest abuse.[2] The possession of special knowledge in a field derived from experience, study, or both makes one an expert.[3]

At the time of trial, Hammond held a master's degree in real estate. He had been licensed as a real estate appraiser for 15 years and had been appraising properties in Georgia for 12 years. Hammond had specialized in appraising commercial properties, including land and office buildings. Hammond also held a real estate broker's license and owned a brokerage company. In addition, he owned another company that focused on developing apartments. During the five years preceding the trial, Hammond had become familiar with the road construction project underlying this case, having provided his opinion of just and adequate compensation in approximately thirty-five condemnations. During those five years, he had reviewed over fifty commercial sales that had occurred since 1995. In this case, Hammond was hired by the DOT to give his opinion of just and adequate compensation due Woodland.

Given Hammond's experience and study, the trial court did not manifestly abuse its discretion in admitting Hammond's opinion, to be given such weight as the jury saw fit.[4]

(b) Woodland next argues that the trial court erred by allowing Hammond to testify that the mining permit covering the property had influenced his valuation of just and adequate compensation, asserting that Hammond was "not qualified as an expert witness with regard to mining operations and permits."

Hammond testified that he had learned from the Georgia Environmental Protection Division (EPD) that none of Woodland's 800-plus acres, including the 0.913 acre acquired by the DOT, had been released by that agency from the mining permit. He testified that until the EPD released the property from the mining permit, the land could not be developed. Hammond assumed that there was some time, effort, and risk involved with obtaining such a release, testifying, "I believe that the [land] can be released from this mining permit. I don't believe that it's an easy process." Accordingly, Hammond concluded that the mining permit negatively affected the value of the tract.

The DOT called the program manager for the Municipal Solid Waste and Surface Mining Units for the EPD. His duties included overseeing the permitting, compliance and reclamation of surface mining facilities regulated in Georgia. He testified that the EPD had

---

[2] *Dept. of Transp. v. Great Southern Enterprises*, 137 Ga. App. 710, 712 (1) (225 SE2d 80) (1976).

[3] *In the Interest of C. W. D.*, 232 Ga. App. 200, 206 (3) (501 SE2d 232) (1998).

[4] See *Great Southern Enterprises*, supra.

received, the week of trial, a request from the mining operator to release from the permit 15.2 acres (which apparently included and bordered the acquired property). The EPD denied the request, however, because it failed to show that reclamation requirements had been met.

> Provided an expert witness is properly qualified in the field in which he offers testimony, and the facts relied upon are within the bounds of the evidence, whether there is sufficient knowledge upon which to base an opinion . . . goes to the weight and credibility of the testimony, not its admissibility.[5]

As we have found, Hammond's experience and study authorized the trial court to admit Hammond's opinion of just and adequate compensation. And as Hammond explained, his opinion of such was influenced by the mining permit he believed encumbered the property. Under these circumstances, Woodland's argument goes to the weight and credibility of Hammond's testimony, rather than its admissibility. No abuse of discretion by the trial court has been shown.[6]

2. Woodland contends that the trial court erred by sustaining an objection to its cross-examination of Wilmont McRae Green, Jr., another DOT expert witness who testified regarding just and adequate compensation.

> Although a party has the right to a thorough and sifting cross-examination, the trial court has discretion to limit the scope of cross-examination. Control of the nature and scope of cross-examination is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.[7]

On cross-examination, Woodland's attorney elicited testimony from Green that, when he was valuing the taking, he learned that the county had valued for taxation purposes the approximately 800-acre tract at $3,248,100. This exchange followed:

Q: Well, the tax records are wrong then or what? Are the tax records wrong?

---

[5] *MARTA v. Green Intl.*, 235 Ga. App. 419, 422 (1) (509 SE2d 674) (1998) (citation and punctuation omitted); see OCGA §§ 24-9-67 (2003); 24-9-67.1 (a), (b).

[6] See *MARTA*, supra.

[7] *H. D. McCondichie Properties v. Ga. Dept. of Transp.*, 280 Ga. App. 197, 198 (2) (633 SE2d 558) (2006) (citations omitted).

A: I have no idea.

Q: Well, tell me what they carried on the tax records for valuation of this property on a square foot basis.

A: . . . they don't have it taxed on a square foot — . . .

Q: Okay. Well, let me just say, I believe that it's — do you agree that I believe that it's been taxed for approximately $5.60 a square foot and your valuation of this property is $5.73 a square foot? So it carries a tax value that is as great as your opinion as to value in this case?

A: I have two comments on that. Number one, in 2002, the date of the appraisal, this property was taxed as part of an eight hundred acre tract. Number — number — my second comment is, if the tax office has it appraised at the same thing I do, then they're very good. Because that's exactly what the property is worth.

Q: Okay. And you think that's appropriate that you taxed — that you find an opinion that the tax value is the same thing as your value in this case?

A: I have no —

Q: (Interposing) You're satisfied with that?

. . .

A: I'm satisfied that I'm correct.

Q: All right. Well, let me ask you, do you — do you give any credence whatsoever, Mr. Green, to the fact that the — the property for tax purposes is not valued strictly as fair-market value? It's valued on the basis of uniformity and fair-market value?

At this point, the DOT's attorney objected, arguing that "what the Tax Commissioner did or didn't do has no relevance to this matter" and that the taxable value was not probative of any material issue. Woodland's attorney responded that the questioning went to Green's credibility concerning his methodology in valuing the property, explaining: "[M]y position . . . [is] that if you value the property the same way it's taxed, you're valuing it below fair-market. Because that's not the standard. That's what he needs to do and this jury needs to know he did know the tax value if he did know it." The trial court sustained the objection.

We reject Woodland's argument on appeal that the ruling impermissibly barred it from exploring how Green arrived at his opinion of value. Green had already detailed the methodology he employed to determine just and adequate compensation. On direct examination, he testified that he had inspected the property; he also listed the factors he had considered during his valuation, such as zoning, lack of sewer service on the property, availability of utility services, the

terrain, the mining permit, and the mining operations. Green testified that he had conducted market data research, which included investigating the sales of similar properties in the area around the time of the taking. He stated that he had determined that the highest and best use of the acquired property was for commercial development and that the sales comparison approach was the best method of ascertaining the value of the unimproved 0.913 acre. Further, Green explained his conclusion that the taking had resulted in no consequential damages: "This is simply a strip acquisition. A widening of the road. The remainder of [Woodland's] property is still adequate in size to do the same thing that it could have been used for prior." And on cross-examination, prior to the questioning outlined above, Green repeated much of the above.

The trial court did not abuse its discretion in controlling the nature and scope of the cross-examination of Green in the manner now challenged.[8] The record reveals that Green steadfastly claimed that he had calculated just and adequate compensation based solely upon the steps he detailed and that he had not merely adopted a value close to that assigned by the county for taxation purposes. Moreover, the record reveals that Woodland's attorney was permitted to cross-examine Green about his claimed methodology and further asked Green numerous questions probing the difference between his valuation and the county's.

3. Woodland contends that the trial court erred by striking certain testimony of Russell Bradley, its expert witness on real estate valuation. The trial court determined that the testimony was without sufficient foundation under *Dept. of Transp. v. Benton*.[9] We explained in that case: "The fact that the property is merely adaptable to a different use is not in itself a sufficient showing in law to consider such different use as a basis for compensation; it must be shown that such use of the property is so reasonably probable as to have an effect on the present value of the land."[10] Further, we reiterated, "Even where a different use is shown to be reasonably probable, the jury cannot evaluate the property as though the new use were an accomplished fact; the jury can consider the new use only to the extent that it affects the market value *on the date of taking*."[11]

In *Benton*, the 17.686 acres taken had been part of an undivided, unimproved 123.28-acre tract owned by condemnees.[12] The condemnor complained on appeal that condemnees' expert had valued the

---

[8] See id.

[9] 214 Ga. App. 221 (447 SE2d 159) (1994).

[10] Id. at 222 (1) (citations and emphasis omitted).

[11] Id. (citations omitted).

[12] Id. at 221.

property taken based on " 'hypothetical developed subdivision lots on condemnees' undivided, unimproved tract of land.' "[13] We ruled that the trial court had erred in admitting the expert's valuation testimony because the "testimony valued the land taken as if it were already subdivided ... and as if it were fully developed and sold on the retail market."[14] We explained:

> Condemnees' expert could give his opinion of the value of the land on the date of taking based upon its enhanced value because of its adaptability as a residential subdivision; he could not testify as to the value before and after the taking based upon his assumption of the value as if the property had already been subdivided, but where he gives reasons which appear to be wholly speculative or conjectural, his opinion is without foundation and without probative value.[15]

We ruled similarly in *Colonial Pipeline Co. v. Williams*.[16] There, an expert witness described a method for subdividing unimproved land into separate, identified lots suitable for immediate residential development.[17] We reversed the award for consequential damages because the expert witness had valued the land as if it were already subdivided, at the retail price that would be paid by a purchaser of a subdivided lot.[18]

In the instant case, Bradley set forth how he arrived at his opinion of just and adequate compensation. He had determined, contrary to the DOT's valuation witnesses, that the DOT's acquisition of the 0.913 acre had resulted in consequential damages with respect to the surrounding acreage. He determined that the total land affected (including the 0.913-acre tract) amounted to 15.2 acres.[19] Bradley testified that the highest and best use for the 15.2-acre tract would be to subdivide it "into smaller retail sites for sale . . . and/or development." He testified that he had used the sales comparison approach and had selected as comparable land sales: (1) a one-acre site that had been "carved out of [a] larger parcel" and purchased for the construction of a multi-tenant retail building; (2) a one-acre site purchased by SunTrust Bank for construction of a bank branch; (3) a

---

[13] Id. at 221 (1).

[14] Id. at 222.

[15] Id. (citations and punctuation omitted).

[16] 206 Ga. App. 303 (425 SE2d 380) (1992).

[17] Id.

[18] Id. at 305.

[19] Bradley testified that he believed that this 15.2-acre tract had been released from the mining lease by the mining company.

one-and-one-half-acre site purchased by Bank of America for construction of a bank branch; and (4) a one-acre site, also purchased for construction of a bank branch. Bradley testified that all of these sites were sold to the "end user"; that when the bank branch sites were sold, the sites were ready for construction; and that the remaining site required "[j]ust some grading."

Bradley testified that the 15.2-acre tract, however, had not undergone any development to prepare it for such "end user" level. Rather, the entire tract remained raw and unimproved. Furthermore, when Bradley selected the four parcels as comparable ones, he had not taken into account that the mining permit encumbered the 15.2 acres. He testified, "I didn't know about the permit not being released until two days ago." He conceded that a potential purchaser would want the property being purchased to have been released from the permit before closing, but testified that he did not consider the permit as an "impediment." On cross-examination, Bradley was questioned about why he had selected tracts measuring from one acre to one-and-one-half acres to value a 15.2-acre tract. He responded, "Because typically a larger parcel will sell for less per square foot than a smaller sale."

Upon the DOT's motion to strike Bradley's testimony, the court instructed the jury,

> [T]o the extent that this witness has testified as to the value of the property in question before and after the taking, based upon his assumption of the value as if the subject property had already been subdivided, to the extent this witness has done that, then his testimony is stricken and you may not consider it.

> In condemnation proceedings, it is within the trial court's discretion to determine whether the evidence shows that the subject property is reasonably suited for a use different from its existing use, and it may admit or exclude evidence of value for such other use. Its rulings admitting or excluding such evidence will not be reversed unless there was a manifest abuse of its discretion.[20]

Bradley valued a 15.2-acre tract of raw land encumbered by a mining permit as if it were divided into one- to one-and-one-half-acre tracts of land ready for sale to "end user[s]" for immediate construction of commercial buildings. The trial court did not manifestly abuse its

---

[20] *Colonial Pipeline Co.*, supra at 304 (citation omitted).

discretion in determining that Bradley's valuation was without sufficient foundation under *Benton*.[21]

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED JUNE 29, 2007 —
RECONSIDERATION DENIED JULY 12, 2007 — 

*Chamberlain, Hrdlicka, White, Williams & Martin, Richard N. Hubert*, for appellant.

*Thurbert E. Baker, Attorney General, Dyer & Rusbridge, Robert M. Dyer*, for appellee.

---

[21] See *Benton*, supra at 221-223; *Colonial Pipeline Co.*, supra at 304-305.