528 S.E.2d 278 (2000)
242 Ga. App. 184
In the Interest of S.B., a child.
No. A00A0174.
Court of Appeals of Georgia.
January 18, 2000.
Reconsideration Denied February 2, 2000.
*279 Vicki E. Carter, Athens, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Garcia & Powell, Tony D. Coy, Athens, John C. Shelton, Atlanta, for appellee.
JOHNSON, Chief Judge.
The mother of S.B. appeals from two juvenile court orders: one finding S.B. deprived and one finding reunification inappropriate. We find no error and affirm the decisions of the juvenile court.
On appeal, we view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights should have been terminated; we do not weigh the evidence and must defer to the trial judge as the factfinder.[1]
The decision to terminate parental rights involves a two-step process. First, the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-81(b). Parental misconduct is found when the child is deprived; the cause of the deprivation is lack of proper parental care or control; the cause of the deprivation is likely to continue or will not likely be remedied and the continued deprivation will cause or is likely to cause serious harm to the child.[2] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[3]
Viewing the evidence in favor of the juvenile court's findings, the record shows that the Athens-Clarke County Department of Family & Children Services (the "Department") received custody of 16-month-old S.B. on June 12, 1998. The Department's complaint alleged parental abuse resulted in the death of S.B.'s one-month-old sister, K.B., about one day earlier and stated that S.B. was at a high risk of physical harm due to the nature of K.B.'s death.
At the deprivation hearing, several expert medical witnesses testified about the nature, extent and causation of K.B.'s injuries and death. The children's pediatrician testified that K.B.'s medical condition required the use of an apnea monitor at all times but that the parents failed to use it approximately 80 percent of the time. He also testified that although he had prescribed medication for K.B.'s reflux and aspiration, the mother had failed to have the prescription filled for some time. According to the pediatrician, he began suspecting child abuse after treating K.B. on three separate occasions for a nose injury, for bruises on her back, and for a knee injury. He also treated K.B. for rectal bleeding which he concluded, based on the severity of the bleeding, was caused by trauma.
A neonatologist at St. Mary's Hospital testified that he examined K.B. on June 10 or 11, 1998, and observed that she was comatose, unresponsive and had swelling on her face and right side of her head. He also noted bleeding from puncture wounds on her lower extremities, a lump in the left side of her collarbone, bruises on her forehead and bruises on her lower extremities. X-rays revealed a fractured skull and broken collarbone. *280 While the parents claimed the father had rolled over and slept on top of K.B., the neonatologist testified that K.B.'s fractured skull and broken collarbone could not have occurred in the manner described by the parents or during attempts to resuscitate the child and that the injuries were the result of possible abuse.
Another pediatrician and associate professor of pediatrics and critical care at the Medical College of Georgia testified that the bruising pattern and injuries he observed on the day of K.B.'s death were consistent with physical trauma inflicted on K.B. and that the physical findings were inconsistent with the explanation given by the child's parents. According to this witness, the cause of K.B.'s injuries was child abuse. The witness stated that based on his experience, S.B. was also in danger until the perpetrator of K.B.'s injuries could be positively identified and removed.
The deputy chief medical examiner for the Georgia Bureau of Investigation testified that he had conducted 8,000 to 10,000 medical investigations, including 1,904 autopsies. His autopsy on K.B. revealed a forceful grasping and severe shaking of the child. He testified that a one-month-old child could not move or fall on its own and receive these types of injuries and could not be rolled on and receive these types of injuries. The doctor opined that K.B.'s injuries occurred due to massive blunt force that could only be nonaccidental. He ruled out the possibility of accidental injury by untrained hands performing cardio pulmonary resuscitation or by someone attempting to revive the child by shaking her. There was further testimony that a deep hematoma in K.B.'s rectal tissues strongly suggested sexual abuse.
Throughout the deprivation hearings, S.B.'s mother was present but refused to testify, citing her Fifth Amendment privilege against self-incrimination. Her ex-husband testified that during their marriage they had two other children, that she did not want custody of those children and failed to appear at the court hearing to contest custody and that she had visited with the children only three or four times in the past two years. The children were seven months old and nineteen months old at the time of the divorce in 1994.
A family friend testified regarding the mother's sporadic employment history, history of domestic violence and attempt to influence the friend's testimony. According to the friend, the mother told her that she had been physically abused by her husband, and the friend observed signs of the abuse. Moreover, the mother told her that she was worried about her husband's behavior toward K.B. According to the mother, the husband would take K.B. into the bedroom and not allow her into the room even though she could hear K.B. crying. Before the hearing, the mother asked the friend not to mention anything about her husband taking K.B. into the bedroom and closing the door.
A police detective testified that she investigated the death of K.B. and that though there was no evidence that the mother was the perpetrator of K.B.'s injuries, her failure and refusal to provide a statement to the police about the facts surrounding K.B.'s death could also make her a suspect. The detective testified that the police had no evidence indicating that the mother did anything to protect K.B. from being injured.
The juvenile court ruled that S.B. was deprived and that reunification services were inappropriate.
1. The mother first contends that the juvenile court erred in finding that S.B. was deprived. OCGA § 15-11-2(8)(A) defines a deprived child as a child who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals." The juvenile court found S.B. deprived because the mother (a) was not financially independent; (b) moved in with her former guardian and relied on him for assistance with food, necessities and transportation; (c) told a friend numerous times about instances of family violence and events between her husband and K.B. and (d) failed to keep K.B. hooked up to her apnea monitor as instructed by her doctor. The mother does not dispute these findings but contends that these findings are legally insufficient to find S.B. deprived or to find that the mother is the cause of the deprivation. We find sufficient evidence *281 of deprivation and sufficient evidence that the deprivation resulted from the mother's conduct.
In addition to the facts noted by the juvenile court, the record shows that the mother refused to testify at the deprivation hearing when called as a witness by the Department. Instead, she invoked her Fifth Amendment privilege against self-incrimination. While the mother asserts that she had no part in K.B.'s death, the Supreme Court has held that the invocation of the privilege against self-incrimination in such cases is
an implied admission that a truthful answer would tend to prove that the witness had committed the act. The administration of justice and the search for truth demand[] that an inference may be drawn that witness' testimony would be unfavorable to [her] in a civil action in which the privilege is invoked to protect [herself]. This is particularly true in a child custody contest heard by a trial judge with broad discretion when the inference corroborates other proof of alleged illicit conduct between the parties which affects the welfare and interests of minor children.[4]
Evidence that the explanation provided by the mother and father regarding K.B.'s death is completely inconsistent with the findings of the medical examiner and two other treating physicians, coupled with the mother's refusal to give the police a statement during the investigation and her refusal to testify at the deprivation hearing, allows the inference that the mother was, in fact, involved in the unexplained, intentional death of S.B.'s sibling.
Moreover, even if the mother did not directly contribute to K.B.'s death, the evidence is clear and convincing that the father was abusing K.B. and that the mother suspected the father was abusing her. In fact, she told her friend about her husband's actions and then asked her friend not to mention their conversation at the deprivation hearing. The mother's passivity in response to this tragedy, as well as her attempts to conceal her husband's conduct, renders her culpable as well.[5] We agree with the trial court's conclusion that there is clear and convincing evidence that S.B. is deprived and that her deprivation originated in significant part from the mother.
2. Having found that S.B. is deprived and that such deprivation is caused by her mother, the next factor to be considered is whether the deprivation would likely continue in the mother's care. According to the juvenile court, "[c]ontinuation in the home would be contrary to the welfare of the child, that reasonable efforts have been made to prevent having the child removed from the home and to make it possible for the child to return to [her] home." The mother contends that this finding is inconsistent with the juvenile court's statement that S.B. should remain with her mother.
The mother misconstrues the juvenile court's statement. During the deprivation hearing the juvenile court stated that it wanted a report from the Department before making a decision on whether to place S.B. with the mother's former guardian, with whom the mother was living. The juvenile court was hoping to place S.B. with the former guardian and, consequently, keep her with her mother. However, the Department's subsequent home study of the former guardian indicated that he was not an appropriate placement resource. This home study could not be conducted until some time after the deprivation hearing because the mother would not speak or work with Department officials.
It is well established that in addition to present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation would be likely to continue.[6] Here, the evidence strongly supports the juvenile court's finding that S.B.'s deprivation will likely continue if she is placed in her mother's care. The mother has a sporadic work history, and while she was employed at the time of the deprivation hearing, there was no evidence of any substantial income or of any plans to sustain a substantial income. She is financially dependent on her former guardian for *282 housing, food, necessities and transportation. Moreover, there is strong evidence that the mother may have contributed to K.B.'s death through her passivity and evidence that she lacked involvement with her two other young children, who have remained in the custody of her ex-husband. This evidence supports a finding that the deprivation is likely to continue if S.B. remains in her mother's care.
3. In her final enumeration of error the mother contends that the juvenile court erred in finding that reunification efforts were not appropriate in this case. Following the juvenile court's order finding deprivation, the Department filed a written report concluding that reunification with the mother was not appropriate due to substantial evidence that S.B.'s sibling was injured or killed as a result of the mother's abuse or neglect. The juvenile court conducted a hearing and entered an order concluding that there was clear and convincing evidence that reunification services were not appropriate in the case. While the mother's attorney was present, the mother was not present at the hearing.
It is clear from the juvenile court's order that it relied on evidence presented at the hearing; however, the mother failed to include a transcript of the hearing conducted on this matter in the record on appeal. Accordingly, we must presume that the hearing was conducted in a regular and proper manner and that the evidence supported the trial court's ruling.[7] The burden was on the mother to produce a transcript of the allegedly erroneous matter, and without a transcript we must conclude that the trial court did not abuse its discretion in finding that reunification services were inappropriate.[8]
Judgment affirmed.
McMURRAY, P.J., and PHIPPS, J., concur.
NOTES
[1] In the Interest of D.L.N., 234 Ga.App. 123, 125(2), 506 S.E.2d 403 (1998).
[2] OCGA § 15-11-81(b)(4)(A).
[3] OCGA § 15-11-81(a); see In the Interest of B.D., 236 Ga.App. 119, 511 S.E.2d 229 (1999).
[4] (Citations and punctuation omitted.) Simpson v. Simpson, 233 Ga. 17, 21, 209 S.E.2d 611 (1974).
[5] See In the Interest of C.J.V., 236 Ga.App. 770, 776, 513 S.E.2d 513 (1999).
[6] Id.
[7] See Gaskins v. Fowler, 171 Ga.App. 681, 682(2), 320 S.E.2d 890 (1984).
[8] See Edwards v. State, 271 Ga. 3, 4(2), 514 S.E.2d 833 (1999); Morris v. State, 220 Ga.App. 633, 635-636(3), 469 S.E.2d 848 (1996); In re S.D.S., 166 Ga.App. 344, 346(4), 304 S.E.2d 85 (1983).