534 S.E.2d 892 (2000)
244 Ga. App. 171
In the Interest of J.M.M. et al., children.
No. A00A0551.
Court of Appeals of Georgia.
May 24, 2000.
*893 Quillian, Lonson & Edwards, Michael L. Edwards, Savannah, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Beckmann & Lewis, Leo G. Beckmann, Jr., Savannah, for appellee.
RUFFIN, Judge.
The juvenile court entered an order terminating the parental rights of appellant with respect to her two daughters, J.M.M. and J.A.M. Appellant contends that there was insufficient evidence that she is presently unfit to parent. We disagree and affirm.
A juvenile court may terminate parental rights only if there is "present clear and convincing evidence of parental misconduct or inability" and termination would be in the best interest of the child.[1] The juvenile court determines parental misconduct or inability by finding that (1) the child is deprived; (2) lack of proper parental care or control by the parent in question caused the deprivation; (3) the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[2]
In determining whether a child is without proper parental care or control, the court must consider a number of factors, three of which are relevant here: (1) whether the parent has a medically verifiable mental or emotional deficiency that renders her unable to meet the child's needs;[3] (2) whether the parent has an excessive use or history of chronic unrehabilitated substance abuse that makes her incapable of meeting the child's *894 needs;[4] and (3) "[i]njury or death of a sibling under circumstances which constitute substantial evidence that such injury or death resulted from parental neglect or abuse."[5] In addition, when the child is not in the custody of the parent, the court shall consider whether the parent "without justifiable cause has failed significantly for a period of one year or longer" prior to the filing of the termination petition to comply with a court-ordered plan designed to reunite her with the child.[6]
On appeal of a termination of parental rights, we view the evidence in the light most favorable to the juvenile court's decision to determine whether any rational trier of fact could conclude by clear and convincing evidence that the parent's rights to custody have been lost.[7] We do not weigh the evidence or determine the credibility of the witnesses, and we defer to the juvenile court's factfinding.[8]
Applying this standard, the record shows that appellant has had four children, all fathered by her husband, James.[9] Her first child, a boy, was born when appellant was 16 years old. James allegedly physically abused the boy, who now lives with his maternal grandmother. Appellant's second child, a girl, was born when appellant was 17 years old. This child died at the age of three months after appellant allegedly rolled on top of her and suffocated her.
Appellant's third child, J.M.M., was born on September 14, 1994, when appellant was 18 years old. On October 26, 1994, J.M.M. was taken to the hospital with severe bruising on her face. Appellant testified that J.M.M. was home with her father when the injuries occurred. On November 9, 1994, J.M.M. was taken to the hospital again and was found to have a broken leg. The Department of Family & Children Services (DFCS) obtained emergency custody of J.M.M. on November 10, 1994, and after a hearing, the juvenile court ruled that she was deprived. That order was not appealed. J.M.M. was placed with her mother's aunt and uncle.
DFCS developed a case plan to reunite appellant with J.M.M., and the plan was approved by the juvenile court.[10] The plan required appellant to (1) visit with J.M.M. weekly, if possible; (2) successfully complete parenting classes or group therapy as required by her DFCS caseworker; (3) submit to a psychological evaluation and follow any resulting recommendations; (4) pay child support in the amount of $10 per month; (5) use nonphysical means of discipline with J.M.M.; and (6) participate in a support group for battered women. According to Beth Miller, appellant's first DFCS caseworker, appellant failed to meet these requirements. Between December 1994 and September 1995, appellant visited J.M.M. only about once per month; she enrolled in a parenting class but dropped out after three sessions; she paid child support only once; and she did not participate in a battered women's support group. Appellant did undergo a psychological evaluation but failed to attend recommended follow-up counseling sessions.
In August 1995, a Citizens Review Panel reviewed J.M.M.'s situation and recommended termination of appellant's parental rights. The juvenile court entered an order extending DFCS' custody of J.M.M. and continuing the same case plan. Miller testified that, following the court's order, she tried again to convince appellant to take a parenting class. She also discussed with appellant "the irregular visitation and the need to pay child support." Appellant eventually completed a parenting class in October 1995.
*895 Also in August 1995, J.M.M. was diagnosed with fetal alcohol syndrome. Appellant was pregnant with a fourth child at the time. As a result of the fetal alcohol syndrome diagnosis, appellant's case plan was amended to include the requirement that she complete a substance abuse program. According to Miller, appellant told her that she began drinking heavily after the death of her second child. However, appellant failed to understand that her drinking during pregnancy had an effect on any child being carried in the womb. Miller testified that appellant never completed a substance abuse program while Miller was the caseworker. Miller enrolled her in a program, but appellant would always say "that she was going to go and be there but, yet, would not follow through." In October 1995, appellant gave birth to her fourth child, J.A.M., who was temporarily placed with her maternal grandmother. After holding a hearing, the juvenile court ruled that J.A.M. was deprived and would remain in the custody of DFCS. This order was not appealed.
In March 1996, the juvenile court entered an order continuing J.M.M. and J.A.M. in the custody of DFCS. The order noted that an additional requirement had been added to the case planthat appellant "[r]emain drug and alcohol free and submit to periodic screens." Miller testified that appellant and her husband were then separated and that she had trouble locating appellant. After she found appellant, Miller took her for an unannounced drug screen on May 1, 1996, which was positive for alcohol and marijuana. Six days later, appellant was taken for another drug screen immediately after a court hearing, and the results were negative. Appellant was supposed to get additional drug screens as part of her treatment program, but she did not follow the program.
Following a hearing in May 1996, the juvenile court entered another order extending DFCS' custody of J.M.M. The order, which was not appealed, stated that appellant had a volatile relationship with her husband, that she had moved several times and did not have a permanent address, that she had failed to complete recommended counseling programs, and that she had a "history of chronic, unrehabilitated substance abuse." The order added to the existing case plan the requirements that appellant (1) "[p]rovide a stable, adequate, and safe residence"; (2) notify her caseworker of changes in her address, telephone number, or living arrangements; and (3) find stable employment or other means of providing for J.M.M.
Miller testified that from the date of that order until she left DFCS in August 1996, "basically there was no change" in appellant's lack of compliance with the case plan. Appellant moved frequently and had an unstable personal life. One morning she told a Citizens Review Panel that she planned to marry a trucker; later that day she told Miller that she wanted to reconcile with her husband. She continued to miss counseling appointments and visitations with her children, even though she lived on a bus route and Miller offered her bus tickets. Miller reviewed the case plan with appellant on a monthly basis and explained that appellant's parental rights could be terminated if she did not comply with the plan. According to Miller, "[t]he problem was, she was good at verbalizing what her intents were to get the kids back but as far as a consistent follow through, that didn't happen."
In August 1996, a different DFCS caseworker, Karen Sisk, took over the case of J.M.M. and J.A.M. At that point, appellant was living in South Carolina with a new boyfriend, John Moore, and his mother. Appellant indicated that Ms. Moore would help her take care of the girls, but when Sisk tried to evaluate Ms. Moore's situation, she was unable to find her. Sisk later learned that appellant and John Moore had left Ms. Moore's home and moved twice by Thanksgiving 1996.
On February 19, 1997, DFCS filed a petition to terminate appellant's parental rights. After a hearing later that month, the juvenile court entered an order extending DFCS' custody of J.M.M. pending the outcome of the termination hearing. In late February, appellant asked Sisk to evaluate her South Carolina residence for placement of J.M.M. and J.A.M. South Carolina authorities completed the evaluation through an interstate compact agreement and disapproved the *896 placement. Since Sisk became the caseworker, appellant has visited her daughters more regularly, but she still misses visitations. Appellant did not visit J.M.M. and J.A.M. at all in December 1996 because she was having "some problems" with her boyfriend, Moore. They reconciled, however, and appellant continued to live with Moore, although she remained married to the girls' father. Sisk encouraged Moore to come to the visitations, as he would be a primary caretaker if custody were returned to appellant, but Moore attended only one visit and the girls did not know him. At one point, Sisk asked Moore for some information over the telephone, and he "became belligerent and began to curse."
At the time of the termination hearing, appellant still had not completed a substance abuse treatment program. Sisk testified that she had tried three times to contact appellant for a drug screen but could not reach her. Appellant had paid only $80 in child support and was $210 in arrears. Although appellant claimed to be enrolled in adult education classes, Sisk received no verification of this.
Sisk testified that J.M.M. and J.A.M. are currently in suitable placements with relatives and that they are adoptable.
Dr. Frances Hinchey, the psychologist who evaluated appellant, testified that she suffers from a personality disorder, is immature and self-centered, has difficulty maintaining a stable lifestyle, and does not empathize well with the needs of others. Dr. Hinchey concluded that appellant is not "a good candidate to be a custodial parent," particularly with respect to J.M.M., who will require "considerable academic remediation" due to the fetal alcohol syndrome. According to Dr. Hinchey, the children would be "in danger" if placed in their mother's custody because she is not likely to change. Dr. Hinchey also testified that she smelled alcohol on appellant's breath during one visit.
Appellant's aunt testified that appellant had no parental relationship with her son. The aunt also testified that she saw appellant hitting her son on the head at a family gathering in 1996. Another witness testified that appellant does not contribute to her son's care, that she was using drugs the night her second child died, that she "never shed a tear" when the child died, and that she never puts her children ahead of herself. Finally, J.M.M.'s custodial parent testified that appellant would sometimes schedule visits with J.M.M. and not appear.
Based on this evidence, the juvenile court found that appellant had not complied with the case plans designed to reunite her with her children, that she had a history of unrehabilitated substance abuse, and that she was not likely to change. Thus, the court concluded that appellant could not adequately care for her children, and it terminated her parental rights.
Appellant concedes that J.M.M. and J.A.M. are deprived and that the deprivation is caused by a lack of proper parental care or control.[11] She argues, however, that there is no evidence that the deprivation is likely to continue. According to appellant, the juvenile court based its conclusions on stale evidence and failed to consider her recent progress. We disagree.
"The past conduct of the parent is properly considered by the court in determining whether ... conditions of deprivation are likely to continue."[12] There was ample evidence of appellant's past parental unfitness. First, she had no parental relationship with her oldest child, and she smothered her second child to death while apparently on drugs.[13] Second, she has been diagnosed with a personality disorder that impairs her ability to meet the needs of her children.[14] *897 The psychologist who evaluated appellant testified that this disorder is unlikely to change over time and that her children would be "in danger" if returned to her custody. Third, there was evidence that appellant has a chronic, unrehabilitated substance abuse problem. Among other things, appellant admitted that she began drinking heavily after the death of her second child; her third child, J.M.M., has been diagnosed with fetal alcohol syndrome; appellant failed an unannounced drug screen even though she knew alcohol abuse was an issue in this case; her psychologist smelled alcohol on her breath during a counseling session; and she has never completed a substance abuse treatment program. Fourth, although the DFCS case plans designed to reunite her with her children were in place for more than two and one-half years before the termination hearing, appellant never completed the goals of those plans.[15] She paid only about one-third of the child support she owed, did not follow through with recommended counseling, missed scheduled visits with her children, and did not complete a substance abuse treatment program. Additionally, she failed to establish a safe, stable residence and instead moved frequently and had volatile personal relationships.
Appellant insists that "May of 1996 was a turning point," after which "her efforts increased dramatically." The record does show that appellant eventually completed a parenting class, paid some child support, and began visiting her children more regularly. But other case plan goals, such as mental health counseling and substance abuse treatment, remained unfulfilled. In addition, appellant moved out of the state and began living with a man who did not know her children and showed no interest in them, and South Carolina officials disapproved their residence as a placement for J.M.M. and J.A.M. And, the psychologist testified that appellant's personality disorder is unlikely to improve. Thus, appellant's recent efforts, "while commendable, are insufficient to invalidate the juvenile court's finding of clear and convincing evidence demonstrating that the deprivation was likely to continue."[16] Moreover, "[t]he court must base its decision on more than positive promises of good behavior which the past has proven will not be carried out."[17]
Because we conclude that there was sufficient clear and convincing evidence that the deprivation of J.M.M. and J.A.M. would likely continue if they were returned to appellant's custody, we affirm.[18]
Judgment affirmed.
ANDREWS, P.J., and ELLINGTON, J., concur.
NOTES
[1] OCGA § 15-11-81(a).
[2] OCGA § 15-11-81(b)(4)(A).
[3] OCGA § 15-11-81(b)(4)(B)(i).
[4] OCGA § 15-11-81(b)(4)(B)(ii).
[5] OCGA § 15-11-81(b)(4)(B)(vi).
[6] OCGA § 15-11-81(b)(4)(C)(iii).
[7] In Interest of M.N.H., 237 Ga.App. 471, 472(1), 517 S.E.2d 344 (1999).
[8] Id.
[9] Some of these facts are taken from unappealed interim orders of the juvenile court. Appellant does not challenge the factual findings in those orders.
[10] The plan was also designed to reunite J.M.M. with her father. As he voluntarily relinquished his parental rights in August 1996, however, we do not discuss the plan as it applied to him.
[11] See In Interest of L.H., 236 Ga.App. 132, 134, 511 S.E.2d 253 (1999) ("Since no appeal was taken from the deprivation order, [the parent] is bound by that determination.").
[12] (Punctuation omitted.) Id. at 136, 511 S.E.2d 253.
[13] See id. at 135-136, 511 S.E.2d 253 (parent's inability to care for previous children was "properly considered in the decision to terminate her parental rights").
[14] See id. at 135, 511 S.E.2d 253 ("A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination.") (punctuation omitted).
[15] See In the Interest of M.N.H., supra at 473-474, 517 S.E.2d 344 (failure to meet goals of reunification plan will support termination).
[16] In Interest of J.C., 237 Ga.App. 533, 536(1), 515 S.E.2d 847 (1999); see also In Interest of J.S., 232 Ga.App. 876, 880, 502 S.E.2d 788 (1998) ("a few months of partial stability does not establish for the court that the parents are capable of maintaining the progress") (punctuation omitted).
[17] In Interest of C.W.D., 232 Ga.App. 200, 204(1), 501 S.E.2d 232 (1998).
[18] As appellant does not challenge the sufficiency of the evidence to support the juvenile court's conclusion that termination of appellant's parental rights was in the best interests of the children, we need not consider that issue.