560 S.E.2d 125 (2002)
253 Ga. App. 669
In the Interest of M.V. et al., children.
No. A01A1790.
Court of Appeals of Georgia.
February 12, 2002.
*126 Michael R. McCarthy, Dalton, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Richard K. Murray, Dalton, for appellee.
RUFFIN, Judge.
The Whitfield County Juvenile Court terminated the parental rights of the natural mother of M.V., R.M., and J.V. In her sole enumeration of error, the mother argues that the juvenile court lacked clear and convincing evidence that her rights should be terminated.[1] We disagree and thus affirm.
In reviewing a juvenile court's termination of parental rights, we view the evidence in the light most favorable to that court's decision, and we will affirm if the record demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[2] So viewed, the record shows that the mother had four children, M.V., R.M., J.V., and K.G. In April 1999, before K.G. was born, the Department of Family & Children Services (DFACS) became involved with the mother's family after receiving a report that M.V. and R.M. had bruises. According to the report, the bruises were believed to have been caused by Moises Garcia, the mother's live-in boyfriend, who had fathered the two youngest children, J.V. and K.G.[3] A DFACS investigator interviewed the mother and Garcia, who both denied injuring the children.
*127 In April 2000, the mother went with her children to a crisis center for battered women. Although the mother claimed that she had not been abused for several years, she was allowed to stay at the center based upon the recommendation of DFACS. Kim Harrison, a children's advocate at the center, saw that the mother's infant, K.G., had a bite mark on her face. She picked up the baby and discovered that the back of her head was abnormal and swollen. The mother attributed the head injury to J.V., claiming the child pulled the baby off of a bed. When Harrison asked the mother about the bite mark, she indicated that it was the result of a kiss. At Harrison's insistence, they took the baby to the emergency room, where she was admitted for a skull fracture.
The mother left the crisis center on April 20, 2000. Prior to her departure, she signed a DFACS "safety plan," which required her to "check with DFACS before [Garcia was] allowed back in the home."
On May 3, 2000, DFACS received notice that M.V., who was ten, had missed school because she was home caring for her three younger siblings. A DFACS investigator went by the mother's house on May 10, but found no one at home. The next day, DFACS learned that the mother and Garcia were at the hospital with their baby, K.G., who had died as a result of blunt trauma to her skull. According to a doctor who examined the body, the baby showed signs of a recent blow to the head in addition to the previous skull fracture. At the hospital, neither the mother nor Garcia provided any explanation for how the baby had been injured. When law enforcement officers attempted to interview them on a later date, Garcia indicated that they would not speak to the officers without their lawyer present.
Law enforcement officers interviewed M.V. and her eight-year-old sister, R.M., following their sister's death.[4] M.V. reported seeing Garcia hit the baby on her head, and R.M. said that she saw Garcia throw the baby. Both the mother and Garcia were charged with cruelty to children.
DFACS took the mother's surviving children into protective custody on May 11, 2000. Shortly thereafter, DFACS filed a deprivation petition, and the juvenile court conducted a hearing on June 22, 2000. The mother and Garcia both appeared at the hearing, but refused to testify, asserting their Fifth Amendment right against self-incrimination. Following the hearing, the juvenile court found that Garcia likely had caused the baby's death, but that the mother also was culpable for having exposed her children to abuse. Thus, the court ruled that the children were deprived, and the mother has not appealed this ruling.
At the juvenile court's direction, DFACS created a case plan for the mother, which set forth several goals for her, including maintaining stable housing and income, developing improved parenting skills, and complying with recommended psychological treatment. Evidently, the mother failed to fully comply with the plan, and DFACS filed a petition to terminate her parental rights. Rather than holding a new hearing, the parties stipulated that the evidence would consist of the transcript from the deprivation hearing, psychological evaluations of the mother and Garcia, and the DFACS case plan and progress reports.[5] On February 27, 2001, the juvenile court entered an order terminating the mother's parental rights.
On appeal, the mother asserts that the trial court erred in terminating her rights because "[t]here was no probative evidence or even hearsay to suggest that [the mother] had injured [her baby] in any matter... [and] the evidence was not clear and convincing that [the mother] aided and abetted in any abuse inflicted upon the baby." We disagree.
In a termination of parental rights proceeding, the juvenile court employs a two-step *128 process.[6] First the juvenile court must determine whether there is clear and convincing evidence of parental misconduct or inability, which shall be proved by demonstrating
that (1) the child is deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. Once the trial court establishes a lack of parental care and control, the second part of the test for determining whether parental rights should be terminated is whether such termination is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.[7]
With regard to the first factor, the unappealed deprivation order establishes that the children are deprived.[8] As to the second factor, the juvenile court was authorized to "consider evidence of past egregious conduct of the parent toward the child[ren] of a physically cruel or abusive nature."[9] Here, the record demonstrates that one of the mother's children was beaten to death. Even if the evidence does not suggest that the mother administered the beating, it certainly supports the juvenile court's conclusion "that the injuries were attributable to her inability to protect her child, which also constitutes lack of proper parental care and control."[10]
Contrary to the mother's contention on appeal, the record is not devoid of evidence demonstrating her culpability. At the deprivation hearing, the mother did not testify, but invoked her Fifth Amendment privilege against self-incrimination. The Fifth Amendment, which clearly can be invoked in such civil context, "shields against compelled self-incrimination, not legitimate inquiry, in the truth-seeking process."[11] Thus, a litigant in a civil case may risk disadvantage "by refusing to provide material facts for fear of self-incrimination in a pending criminal case."[12] In a termination of parental rights case, if a party invokes the Fifth Amendment, the trial court may infer that a truthful answer would be harmful.[13]
Here, the statements of the mother's older two children suggest that Garcia beat the baby. But the mother's refusal to testify permits an inference that she knew about the abuse and failed to protect her infant, resulting in the child's death. Under these circumstances, we agree with the juvenile court that the mother's children are deprived and that such deprivation originated from the mother.[14]
The record also demonstrates that the deprivation is likely to continue. "It is well established that in addition to present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation would be likely to continue."[15] Here, the mother has demonstrated passivity in the face of deadly child abuse. The juvenile court was not required to return the mother's other children to her custody until one of them suffered a serious *129 injury or possibly death.[16] Moreover, the record further reveals that the mother did not fully comply with the reunification plan, which was a prerequisite to retaining her parental rights. It follows that the trial court was authorized to find that the deprivation was likely to continue.[17]
Finally, the juvenile court was authorized to conclude that the termination of the mother's parental rights was in the children's best interests. In looking at this second prong, the court may consider the same factors that supported its finding of parental inability.[18] For the reasons discussed above, the trial court had ample evidence from which to conclude that termination of parental rights was in the best interests of the children.
Judgment affirmed.
JOHNSON, P. J., and ELLINGTON, J., concur.
NOTES
[1] The juvenile court also terminated the parental rights of both natural fathers, neither of whom appealed the order.
[2] See In the Interest of J.M.M., 244 Ga.App. 171, 534 S.E.2d 892 (2000).
[3] M.V. and R.M. were fathered by another man who evidently resides in Mexico.
[4] J.V., the other surviving child, was 21 months old.
[5] The juvenile court also left the record open for three weeks for the addition of deposition transcripts and medical reports. It does not appear, however, that any additional evidence was tendered.
[6] See In the Interest of K.L., 234 Ga.App. 719, 722, 507 S.E.2d 542 (1998).
[7] (Punctuation omitted.) In the Interest of D.P., 244 Ga.App. 553, 554, 536 S.E.2d 225 (2000).
[8] See In the Interest of S.H.P., 243 Ga.App. 720, 722(1)(a), 534 S.E.2d 161 (2000).
[9] (Punctuation omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 736(3), 534 S.E.2d 452 (2000).
[10] Id.
[11] (Punctuation omitted.) Anderson v. Southern Guarantey Ins. Co., 235 Ga.App. 306, 310, 508 S.E.2d 726 (1998).
[12] Id. at 311, 508 S.E.2d 726.
[13] See In the Interest of S.B., 242 Ga.App. 184, 186-187(1), 528 S.E.2d 278 (2000) (invocation of privilege "is an implied admission that a truthful answer would tend to prove that the witness had committed the act").
[14] See id. at 187, 528 S.E.2d 278.
[15] Id. at 188(2), 528 S.E.2d 278.
[16] See V.M.T., supra at 736, 534 S.E.2d 452.
[17] See S.B., supra; see also In the Interest of M.C.L., 251 Ga.App. 132, 135(1)(a), 553 S.E.2d 647 (2001) ("Repeated failure to comply with [case plan] goals may show that the cause of the deprivation is likely to continue.").
[18] See In the Interest of C.T., 247 Ga.App. 522, 524(1), 544 S.E.2d 203 (2001).