A01A2086. IN THE INTEREST OF B. W., a child.
(561 SE2d 199)

MIKELL, Judge.

B. W.'s father appeals the order denying his motion to set aside the juvenile court's judgment terminating his parental rights.[1] We affirm.

On appeal from an order terminating parental rights, this Court must determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *In the Interest of L. M.,* 219 Ga. App. 746, 748 (2) (466 SE2d 887) (1995). We neither weigh the evidence nor determine the credibility of witnesses; rather, the reviewing court defers to the lower court's factfinding and affirms unless the appellate standard of review is not met. *In the Interest of C. J. V.,* 236 Ga. App. 770 (513 SE2d 513) (1999).

Construed most favorably to the Georgia Department of Human Resources, the evidence shows that on June 8, 1996, B. W., who was two and a half months old, was taken to an emergency room for treatment of a broken arm. Suspecting abuse, the physicians decided to perform a complete radiographic examination on the baby. Dr. Mark Hudson testified that the test showed multiple rib fractures that

---

[9] (Citations and punctuation omitted.) Id. at 811 (2).
[1] The order also terminated the mother's rights to B. W., but she does not appeal.

were temporally unrelated to the arm injury. He also explained that "[i]t takes a great deal of directed force to fracture the ribs on a child." A CAT scan revealed "quite a large collection of blood underneath the scalp" that necessitated surgery to relieve the pressure inside the baby's brain. The infant's vision was unfocused, leading the physician to suspect an intracranial hemorrhage. Dr. Hudson concluded that the infant's injuries were consistent with "shaken baby syndrome."

The hospital notified the Grady County Department of Family & Children Services (the "Department") as well as the sheriff's department about the broken arm. B. W.'s mother was summoned for an interview. When asked how the baby's arm was broken, she claimed that the father had passed out while holding the child after drinking rubbing alcohol mixed with cola. The mother later recanted this statement but offered no further explanation. During the interview, the Department was notified of B. W.'s rib injuries, and the child was taken into protective custody.

The record shows that on March 19, 1997, the father pleaded guilty to one count of cruelty to children for breaking B. W.'s arm. He was sentenced to twenty years, five to serve and fifteen on probation. The child's mother was tried, convicted, and sentenced to serve 20 years. The record also shows that on July 24, 1997, the father's parental rights to another child were terminated based on evidence that the child sustained numerous bone fractures while in her parents' care. That child's foster care worker testified that the little girl came home from the hospital in a body cast.

1. In considering whether to terminate parental rights, the juvenile court is first required to determine whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94 (a). This determination is made by finding that the child is deprived, that the cause of that deprivation is lack of proper care or control by the parent, and that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A).

In the case sub judice, the father challenges the sufficiency of the evidence to support the court's determination that the cause of B. W.'s deprivation will likely continue. Specifically, while acknowledging the "serious incident of child abuse," the father contends that the evidence failed to show that he is presently unfit to parent B. W. This argument is specious. A parent's past conduct is properly considered in determining whether conditions of deprivation are likely to continue. *In the Interest of R. M.*, 232 Ga. App. 727, 728 (503 SE2d 635) (1998). Although incarceration alone does not always compel a termination of parental rights, it will support such a ruling when adequate aggravating circumstances are shown to exist. *Stills v. Johnson*, 272

Ga. 645, 651-652 (3) (533 SE2d 695) (2000). The father's plea of guilty to an indictment charging him with "maliciously caus[ing B. W.] . . . cruel and excessive physical pain by breaking [his] left arm" coupled with the evidence recounted in the order terminating the father's rights to B. W.'s sister constitutes sufficient aggravating circumstances. *In the Interest of R. M.*, supra at 728. It follows that clear and convincing evidence supports the trial court's findings.

2. The father next contends that the admission into evidence of two medical depositions violated his due process rights because he never received a notice of deposition while incarcerated. The Department asserted that notice had been served upon the father in jail, but the father testified that he never received the notice. Pretermitting whether the admission of this evidence violated OCGA § 9-11-30 (b) (1), any error was harmless. The father's counsel argued at the hearing that the depositions should be excluded from evidence because they were merely cumulative of Dr. Hudson's live testimony. It is axiomatic that the erroneous admission of evidence that is merely cumulative of testimony that has already been presented will not warrant a new trial. *Harris v. Tatum*, 216 Ga. App. 607, 610-611 (2) (455 SE2d 124) (1995).

3. Finally, the father argues that the court erred in refusing to order the Department of Human Resources to place B. W. with his paternal grandmother, S. W. We disagree.

Where, as here, an order is entered terminating the rights of both parents, OCGA § 15-11-103 (a) (1) requires the court to attempt to place the child with a relative, but only if such placement is in the best interest of the child. *In the Interest of L. M. J.*, 247 Ga. App. 756 (2) (545 SE2d 127) (2001). In the instant case, B. W.'s paternal grandmother, S. W., testified that she knew very little about the child, having seen him only twice. S. W. opined that B. W. did not need to be protected from the father. She also testified that she trusted the father to the point that she might eventually allow him to be alone with B. W. if she were allowed to adopt him. Two foster care caseworkers, Pam Glover and Susan Arnold, testified that placing B. W. with S. W. would not be appropriate. Glover testified that she spoke with S. W. on numerous occasions, and S. W. did not believe that the father had injured the child. Glover expressed concern that the child might be injured while in S. W.'s custody. Arnold testified that B. W. had been hospitalized three or four times before the final incident of abuse and that S. W. was aware of all the hospitalizations and injuries to the child. According to Arnold, S. W. "never once attempted to protect [B. W.] by informing the physicians . . . of the damage the parents had done." In addition, Arnold noted that the child was doing very well in foster care. Under these circumstances, we find no abuse of discretion in the trial court's determination that it was not in

B. W.'s best interest to place him with his paternal grandmother. *In the Interest of S. K.*, 248 Ga. App. 122, 129 (3) (545 SE2d 674) (2001).
*Judgment affirmed. Blackburn, C. J., and Pope, P. J., concur.*

DECIDED FEBRUARY 27, 2002.

*Paul Fryer*, for appellant.
*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Williams & Spears, Catherine M. Williams, Robert Culpepper III*, for appellee.