2. *Best Interests of the Children.* When clear and convincing evidence exists of parental misconduct or inability, the juvenile court then considers whether termination of parental rights is in the best interests of the children, in light of the physical, mental, emotional, and moral condition and needs of the children, including the need for a secure and stable home. OCGA § 15-11-94 (a). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Citation and punctuation omitted.) *In the Interest of J. B. A.*, 230 Ga. App. 181, 185 (2) (495 SE2d 636) (1998).

A02A1696. IN THE INTEREST OF A. M. et al., children.
(578 SE2d 226)

ADAMS, Judge.

The mother of A. M., B. M., and D. M. appeals from the termination of her parental rights. We affirm.

The record shows that the Houston County Department of Family and Children Services became involved with the children when a local hospital notified DFACS that 15-year-old A. M. had been diagnosed with pelvic inflammatory disease. A. M. reported that she had

been sexually assaulted by her mother's boyfriend, Thomas McElroy. DFACS sought an order of deprivation after their initial investigation revealed that McElroy had fathered a child with the mother's oldest daughter when she was a minor; that the mother was aware of this, but continued to allow McElroy contact with the family; and that A. M. had told her mother that McElroy had sex with her, but the mother told A. M. not to say anything about it. After A. M. reported her claim of abuse against McElroy, D. M. also reported that she had been molested and that her mother told her not to tell anyone. The trial court entered an order of deprivation, and the children were placed in DFACS's temporary custody.

Although DFACS initially pursued a plan of reunification, it subsequently filed a motion to adopt a nonreunification case plan and a motion to cease visitation. At the hearing on these motions, Barbara West, the DFACS case manager assigned to the children's case, testified. She stated that under the reunification case plan, the mother was required to obtain employment, to cease contact with McElroy, and to follow the recommendations of the family assessment report. West reported that although the mother was employed at one point in time, she no longer had a job; that she was still having contact with McElroy; and that she failed to follow the family assessment's recommendations for counseling and therapy.

West also said that the children would become "out of sorts" after visits from their mother. Both A. M. and D. M. talked about committing suicide after visits, and B. M. had problems managing his anger. The children became especially upset after their mother tape-recorded a visit with them. West stated that the children were receiving individual and family counseling.

Sergeant Charles Bishop of the juvenile division of the Houston County Sheriff's Department testified that a few weeks prior to the hearing, he received a tip that the mother was having contact with McElroy. Based upon that tip, he was able to videotape and observe the mother, her oldest daughter, the daughter's child fathered by McElroy, McElroy, and others drive up together in a rental car to the mother's van, which was parked in a parking lot. He saw McElroy remove some items from the car in which they arrived and place them in the mother's van. McElroy was arrested at that time for violating the terms of his bond, which required him to have no contact with any children under the age of 18 and no contact with the mother's family.

Bishop said that he asked the mother at that time why she was continuing her relationship with McElroy, and she replied that she was going to keep seeing McElroy and that it was all "a big mistake." She told Bishop that he "needed to quit following her around and meddling in her business." But at his request, she gave him a copy of

the audiotape she had made of a visit with her children. Bishop also testified that McElroy had pleaded guilty to a charge of statutory rape in connection with the charges involving A. M. and was in jail.

Beth Escalante, director of the group home where the children were staying, testified that after the mother telephoned A. M. on one occasion, A. M. came to them "very upset" saying that her mother had asked her to change her story regarding McElroy's sexual abuse. A few days later D. M. began making self-abusive gestures and threatening to kill herself. A. M. also stated several times that she was going to kill herself.

Escalante stated that after that, the mother's visits appeared to cause turmoil in the children for several weeks afterward. Escalante testified that although the children were glad to see their mother at the visits, when it was time for her to leave, they would argue among themselves. The mother also called on several occasions to say she was coming but never showed up, which upset the children. On the last visit, the mother had a tape recorder and told the children to answer her questions because the judge said they could come home if they did. The children became upset because they believed what their mother had told them, but yet they did not get to go home.

Escalante said that the children were very well behaved for the most part and usually very stable, until the visits occurred. Although the children appear to love and miss their mother, she said that they appear well adjusted when they do not see her. She testified that the children's reaction to the mother's visits was more severe than that of most children in her care following a parent's visit.

The mother's oldest daughter also testified that she had accompanied her mother each time she visited the children and that she had never heard her mother ask A. M. to change her story about the abuse. The oldest daughter's fiancé testified that he was present at the meeting between the mother and McElroy. He stated that the mother had given McElroy the van, and that they had picked up McElroy that morning to take him to the van. He said that as far as he knew that was the extent of the contact between the mother and McElroy.

At the close of the evidence, both the children's guardian ad litem and their court-appointed special advocate recommended that the plan of nonreunification be approved. The trial court granted both motions.

A short time later DFACS petitioned to terminate the mother's parental rights. The trial court held a separate hearing on the termination petition, but took judicial notice of the evidence introduced in connection with the prior motion regarding a plan of nonreunification. The trial court also vacated its prior order regarding nonreunifi-

cation and consolidated the matter into a hearing on the termination petition.

Boyd Anderson, the marriage and family therapist who prepared the family assessment report in the case, testified that he had met with the mother and the children. He said that in his conversations with the mother, it became evident that she did not see anything inappropriate with her daughters having a sexual relationship with McElroy. The mother gave the impression that because her daughters had consented to the sexual relationship, she felt there was nothing wrong with it. He stated that this attitude exposed the children to a number of dangers, including pregnancy, emotional and physical trauma, sexually transmitted diseases, as well as psychological effects.

West testified again at the termination hearing. She reported that DFACS was attempting to find placement and had determined that no relatives could provide a suitable home. But she said that two families had expressed interest in adopting B. M. and D. M. A. M., who was 16, was scheduled for an independent living program that offers potential assistance until she is 21 years old. West testified that she had visited the children a few weeks before the hearing and that they were doing well in school. A. M. was receiving tutoring to assist her in her classes, and all three children were receiving individual and group therapy. West also stated that the mother had failed to pay the court-ordered child support payments.

The mother testified that she had had no contact with McElroy since she took him to her van in the parking lot. She said that she does not anticipate ever being around him again. The mother stated that she loved her children and was willing to do anything DFACS asked of her to be reunited with her children. She stated that she understood that it was inappropriate for her minor children to be engaging in sexual activity and that she would make sure the children got the help they needed to address their physical and mental health needs.

The mother stated that after she learned that McElroy was the father of her oldest daughter's child, she never dated him again, but she continued to have contact with him and to allow him in her home. She also admitted that after she learned that McElroy had sexually assaulted A. M., she gave him a ride to court the next day. She said she believed him "in a way" when he said that nothing had happened between A. M. and him. She also took a job at the same place McElroy worked, but she said she was on a different shift. She acknowledged that it had been a mistake to maintain contact with him.

Following this hearing, the trial court entered an order terminating the mother's parental rights. Her sole ground on appeal is that

there was insufficient evidence to support the trial court's finding that her children's deprivation was likely to continue.

> In determining whether a termination of parental rights is supported by sufficient evidence, we construe the evidence and all reasonable inferences from it in a light most favorable to the trial court's ruling and ask whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost.

(Citation omitted.) *In the Interest of J. E. L.*, 223 Ga. App. 269 (1) (477 SE2d 412) (1996). "This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (Citation omitted.) *In the Interest of D. H.*, 243 Ga. App. 778, 782 (1) (534 SE2d 466) (2000).

The juvenile court employs a two-prong analysis for determining whether parental rights should be terminated under OCGA § 15-11-94. "First, the court determines whether there is clear and convincing evidence of parental misconduct or that the parent is unable to care for and control the child. Second, the court determines whether termination is in the best interest of the child." (Citation omitted.) *In the Interest of S. H. P.*, 243 Ga. App. 720 (534 SE2d 161) (2000).

A finding of parental misconduct or inability requires clear and convincing evidence of the following four factors:

> 1) that the child is deprived; 2) that the cause of the deprivation is a lack of proper parental care or control; 3) that the cause of the deprivation is likely to continue or will not likely be remedied; and 4) that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. OCGA § [15-11-94] (b) (4) (A).

(Citation and punctuation omitted.) *In the Interest of J. M. B.*, 231 Ga. App. 875, 876 (501 SE2d 259) (1998).

The trial court found that the children were deprived at the time they first came into DFACS's custody due to the instances of sexual abuse, and the mother never appealed that determination. "Therefore, [the mother] is bound by this finding of deprivation and the first factor is satisfied." (Citations and punctuation omitted.) *In the Interest of M. E. C.*, 228 Ga. App. 9, 10 (1) (a) (491 SE2d 107) (1997).

The second factor, that the deprivation was the result of a lack of proper parental care or control, is also supported by the record. The mother's continued contact with McElroy after he impregnated one minor daughter made possible, in part, his actions toward her other daughters. And the record shows that her reaction to the reports of

abuse was not to offer aid and assistance to her daughters, but rather to cover up the abuse and to maintain contact with the abuser. Although McElroy was primarily responsible for the abuse, "the mother's passivity in response to this tragedy renders her culpable as well." (Citation omitted.) *In the Interest of C. J. V.*, 236 Ga. App. 770, 776 (513 SE2d 513) (1999).

The mother's sole contention on appeal is that there was no clear and convincing evidence to support the third factor, that the deprivation was likely to continue. She noted that DFACS established only two instances in which she had contact with McElroy after A. M. reported the sexual abuse, and she offered reasons to explain those contacts. Moreover, she testified that she intended to have nothing further to do with McElroy, and that testimony was unrebutted.

But the trial court is entitled to consider evidence of the mother's past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future. *In the Interest of D. P.*, 244 Ga. App. 553, 558 (2) (536 SE2d 225) (2000); *In the Interest of C. W. D.*, 232 Ga. App. 200, 204 (1) (501 SE2d 232) (1998). The evidence showed that the mother continued to allow McElroy into her home after she learned that he had fathered her oldest, minor daughter's child and had at least some contact with him after she learned that he had sexual relations with A. M. And there was evidence that she failed to appreciate that such relations were inappropriate and could be harmful to the children. Moreover, she failed to comply with DFACS's requirements that she get employment to help support her children and that she get counseling to help meet her children's emotional and psychological needs. Accordingly, the trial court was not required to accept her representations regarding the future in light of her past actions:

> Although the mother contends she is now willing to take steps to be a proper parent, judging the credibility of her good intentions was a task for the juvenile court. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.

(Citation and punctuation omitted.) *In the Interest of H. L. W.*, 229 Ga. App. 264, 267 (493 SE2d 637) (1997).

We also find clear and convincing evidence to support the fourth factor, that the deprivation was likely to cause physical, mental, emotional, or moral harm to her children. In addition to the evidence of the mother's failure to protect her children in the past, there was also evidence that current contact with the mother was upsetting and disruptive to the children. The children became upset when she made promises and representations that she did not keep, including

promises that she would visit or that they could come home with her. And A. M. became upset when her mother urged her to lie about McElroy's abuse. Moreover, "the juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care. [Cit.]" *In the Interest of M. L.,* 227 Ga. App. 114, 117 (2) (488 SE2d 702) (1997).

Accordingly, we find that there was clear and convincing evidence of each of the required factors to support the trial court's finding of parental misconduct or inability on the part of the mother.

And "[t]he same factors which show the existence of parental misconduct or inability can also support a finding that termination of parental rights would be in the best interest of the child. [Cit.]" *In the Interest of R. M.,* 232 Ga. App. 727, 729 (503 SE2d 635) (1998). In addition to the evidence discussed above, the record shows that since leaving their mother's custody, the children were doing well in school and in their group home, except for periods following their mother's visits. Moreover, two families had expressed interest in adopting B. M. and D. M., and A. M. was slated for enrollment in an independent program to ease her transition into adulthood. Under these circumstances, we find no error in the trial court's finding that the termination of the mother's parental rights would be in the best interests of the children.

*Judgment affirmed. Ruffin, P. J., and Barnes, J., concur.*

DECIDED FEBRUARY 11, 2003.

*T. Rabb Wilkerson III,* for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Walter G. Sammons, Jr.,* for appellee.

