A06A1961, A06A1962. IN THE INTEREST OF J. B. M. et al., children (two cases).
(644 SE2d 317)

BARNES, Chief Judge.

The biological mother of J. B. M., P. I. R. M., and D. T. C. appeals the juvenile court's termination of her parental rights, claiming in two enumerations of error that the evidence was insufficient to support the termination and that the juvenile court erred in determining that termination was in the best interests of the children.[1]

In a separate action, the husband, who is the putative father of P. I. R. M. and D. T. C., appeals the termination of his parental rights to those children, as well as the termination of his parental rights to his two other children, Z. L. C. and J. W. C., contending that the evidence was insufficient to support the termination and that the juvenile court erred in determining that termination was in the best interests of the children. These related appeals have been consolidated herein for review.

On appeal, we must determine

whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the

---

[1] The putative father of J. B. M. is dead.

credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.

(Citations and punctuation omitted.) *In the Interest of C. L. R.*, 232 Ga. App. 134 (1) (501 SE2d 296) (1998).

## FACTS

The mother in this appeal has three children, eight-year-old J. B. M., three-year-old P. I. R. M., and two-year-old D. T. C. The father is the biological father of only P. I. R. M. and D. T. C. He has two other children, J. W. C. and Z. L. C., and the mother is the stepmother of those two children. The termination of the parental rights of all five children is at issue in this consolidated appeal.

The Department of Family and Children Services ("DFACS") first became involved with the family in 2002 in Murray County after a complaint of inadequate food, shelter, and housing. The initial complaint involved efforts to reunite J. W. C. and Z. L. C. with their biological mother. The children were living with their father and stepmother, who is the mother at issue in this appeal, and DFACS came into the home to offer "help with parenting and any other services that might be needed." DFACS became concerned with allegations of abuse concerning the stepmother, and complaints of physical abuse and inadequate supervision were substantiated in 2003 and 2004. The parents were cooperative with DFACS, and worked with the agency on parenting skills and using appropriate discipline.

The family moved to Whitfield County, and were again referred to DFACS. The caseworkers testified that she tried to provide services to the family, but, unlike before, the parents would not cooperate. She visited the home three times, and was concerned for the children's safety because the mother's demeanor had changed and she was rude. She was also concerned that the house was always dark and the children were always in bed right after school between 3:00 and 3:30 p.m. The mother told her that she had to put them to bed early so that she could rest before going to her third-shift job. She testified that she told her manager that "something was wrong but I couldn't quite put my finger on it."

On May 16, 2005, DFACS received a report that the children had been physically abused, and it filed a complaint alleging that the children were without proper parental care or control in that "the mother figure in the home spanks children with a wooden board." The juvenile court issued an emergency shelter care order for all five children, and they were taken into immediate custody. Subsequently,

the trial court held a detention hearing and concluded that the children were to be held in DFACS's custody "for the purpose of protecting the children." It found that

> the Department has an extensive CPS history of abuse and neglect with this family; there are recent as well as old bruises on all of the five children; [s]ome of the children have admitted that the bruises were inflicted by [the mother] whipping them; the Department has substantiated prior cases of abuse against [the mother] . . . ; the children lack adequate food, clothing and supervision; [o]ne of the children has previously been in foster care in Murray [County]; [and the parents] have been arrested and charged with Cruelty to Children and Aggravated Assault.

On May 19, 2005, DFACS filed a deprivation petition, and following a hearing, the juvenile court placed the children in DFACS's temporary legal custody. In its August 29, 2005 order, the juvenile court found that the parents had appeared for the hearing, agreed to a stipulation that the children were deprived, and it approved concurrent reunification and adoption as the permanent plan. The parents were ordered not to visit the children until the bond restrictions of the criminal charges prohibiting contact with the children were lifted.

Per the case plan, the parents were to submit to a psychological evaluation and comply with the recommendations, complete parenting and anger management classes, pay child support, comply with the service providers, remain substance free, and submit to random drug screens. The case plan was incorporated into the juvenile court's order, and the order was not appealed. In September 2005, based on the review of the citizen's panel, DFACS submitted an updated case plan in which it was noted that the mother had substantially complied with her case plan, but had not visited the children or paid child support. It was also noted that the father had tested positive for illegal drugs, and had not paid child support or visited the children. The juvenile court incorporated these findings and recommendations in an order entered September 29, 2005, which was not appealed.

On September 12, 2005, DFACS filed a petition to terminate the parental rights of the parents, noting, among other things, that the parents had engaged in physical and emotional abuse of the children, they had been charged with five counts of cruelty to children and two counts of aggravated assault, the mother's parental rights to another child had been terminated, and the father suffers from substance abuse problems. Shortly thereafter, a psychosexual evaluation was performed on J. B. M., and in October 2005, DFACS amended the

petition to add allegations that the father had "engaged in conduct of a sexually abusive nature toward the three oldest children, and . . . had been arrested on various offense charges as a result of said sexual abuse."

At the termination hearing, Z. L. C.'s and J. W. C.'s teacher testified that the children were often dirty, unkempt and so hungry that they asked for food and ate crumbs from the floor. Z. L. C. often screamed and had to be restrained, and J. W. C. made sexually improper comments. The teacher testified that the father took them off their medication for attention deficit hyperactivity disorder, and the children became so out of control that they had to be put on a special bus because it was unsafe for them to be on the regular bus.

A forensic interviewer testified that she conducted interviews with J. W. C. and Z. L. C. in October 2005, and both reported that the mother had physically abused them and that the father had repeatedly forced them to engage in anal and oral sodomy. The children described being struck with a shoe, belt, stick, and also being choked. A DFACS caseworker testified about the bruises on the children when they were taken into DFACS custody. J. W. C. had bruises on his arm, legs, and back; J. B. M. had bruises on his back; Z. L. C. had bruises on his back, buttocks, hand, and legs; D. T. C. had bruises on his arm, buttocks, back, and legs; and P. I. R. M. had bruises on her leg and thigh.

The psychologist who evaluated J. W. C., J. B. M., and P. I. R. M. testified that the children reported being physically abused by the mother and father. J. W. C. had stated that the mother hit him and strangled him, and that he was not allowed to leave his room until he went to foster care. The doctor testified that P. I. R. M. exhibited some signs of depression, and that the child's associations with her parents centered on the spankings she received. None of the children reported any sexual abuse during these interviews, but the doctor testified that it was not unusual for the outcry to be delayed until the children built up a rapport with the person.

A clinical psychologist testified that she conducted psychosexual evaluations on J. W. C., J. B. M., and Z. L. C. after J. B. M. acted out sexually, including oral sex with Z. L. C., digital penetration of another child, and urinating on furniture. J. B. M. disclosed that the father touched him, performed oral sex on him, and made him perform oral sex. He said that the father did the same things to J. W. C. and Z. L. C. Z. L. C. disclosed that the mother and father whipped him with a paddle and belt, and that he had watched pornographic films with the parents about 20 times. He also disclosed that the father forced him to perform oral and anal sodomy and that his father did the same thing to J. W. C. because he had heard him scream. J. W. C. told the doctor that the father repeatedly came into

his room and touched his penis, performed oral sex on him, and performed anal sex on him. He said that he had seen the father sodomize P. I. R. M. Z. L. C. said that he did not disclose the abuse because the mother knew it was happening, and J. B. M. said that he told the mother about the abuse but the father never went to jail.

J. B. M. was diagnosed with, among other things, major depressive disorder with psychotic features, post-traumatic stress disorder, and schizoaffective disorder. The doctor diagnosed J. W. C. with, among other things, sexual and physical abuse as a victim, post-traumatic stress disorder, and major depressive disorder with psychotic features. The parents did not testify at the termination hearing. The guardian ad litem recommended that the parental rights be terminated, and commented that the children would be severely harmed if returned to the parents.

Courts apply a two-step analysis for determining whether a parent's right to custody should be terminated:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [Second,] [i]f these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnotes omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000). See also OCGA § 15-11-94 (b) (4) (A).

### Case No. A06A1961

1. The mother of J. B. M., P. I. R. M., and D. T. C. contends that the juvenile court erred in finding sufficient evidence of parental misconduct or inability because there was insufficient evidence that the children's deprived state would not be remedied, and insufficient evidence that allowing the children to have a relationship with her would cause serious physical, mental, or emotional harm. We do not agree.

The mother does not contest the first two factors finding parental misconduct or inability, but argues that the juvenile court erred in

finding that the deprivation was likely to continue or unlikely to be remedied, and was likely to cause serious harm to the child. We disagree.

"A finding of parental unfitness must be based on present circumstances." (Punctuation and footnote omitted.) *In the Interest of L. J. L.*, 247 Ga. App. 477, 480 (543 SE2d 818) (2001). The mother argues that, because she is presently employed and able to provide a stable home for her children, made substantial progress toward completing her case plan, and has fully cooperated with DFACS, that the cause of the children's deprivation is not likely to continue if they are returned to her care. We disagree.

At the time of the hearing, the mother was facing criminal charges related to the physical abuse of her children. Moreover, the evidence also shows that J. B. M. told the mother that he was being sexually abused by the father, but she did nothing. There were also two other substantiated complaints against the mother for physical abuse and inadequate supervision before the 2005 complaint. "Egregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature" is one factor a court may consider in determining whether a child is without proper parental care and control. OCGA § 15-11-94 (b) (4) (B) (iv). See generally *In the Interest of J. M. S. M.*, 240 Ga. App. 294, 296 (523 SE2d 357) (1999).

Moreover, "[a] few months of partial stability do not establish that the parent is capable of maintaining the progress. In considering recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Footnotes omitted.) *In the Interest of A. M. L.*, 242 Ga. App. 121, 124 (1) (c) (527 SE2d 614) (2000). "[T]he trial court is entitled to consider evidence of the mother's past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future." (Citations omitted.) *In the Interest of A. M.*, 259 Ga. App. 537, 542 (578 SE2d 226) (2003).

The court was permitted to consider the mother's past conduct in determining that the deprivation would likely continue, including "demonstrat[ing] passivity in the face of deadly child abuse." *In the Interest of M. V.*, 253 Ga. App. 669, 672 (560 SE2d 125) (2002). The court was not required to return the children to the mother's custody to suffer further physical abuse. Id.

2. Finally, the juvenile court was authorized to conclude that the termination of the mother's parental rights was in the children's best interests. In making this determination, the court could consider the same factors that supported its finding of parental inability. *In the Interest of M. V.*, supra, 253 Ga. App. at 672. In view of the egregious conduct of the defendants toward these children, a rational trier of

fact could have found clear and convincing evidence of parental misconduct or inability, and that termination of the parental rights of the mother would be in the best interests of the children.

*Case No. A06A1962*

The father of J. W. C., Z. L. C., P. C. (P. I. R. M.), and D. T. C. argues that there was no clear and convincing evidence of parental misconduct or inability or that the termination of his parental rights was in the best interests of the children. We disagree.

Viewing the evidence most favorably to the trial court's determination, there was clear and convincing evidence of the four factors required to establish parental misconduct or inability.

(a) As to the first factor, no issue remains as to whether the children are deprived. Because the father did not appeal the trial court's orders finding deprivation, that finding is established for the purposes of this appeal, and we need to consider only the remaining three criteria. *In the Interest of V. S.*, 230 Ga. App. 26, 29 (1) (495 SE2d 142) (1997).

(b) Lack of proper parental care or control as a cause. The failure to appeal the deprivation order renders the juvenile court's determination on this second factor binding as well. *In the Interest of A. G.*, 253 Ga. App. 88, 89 (1) (b) (558 SE2d 62) (2001). Moreover, as discussed earlier, "[i]n determining whether the child is without proper parental care and control, the court shall consider . . . [e]gregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature." OCGA § 15-11-94 (b) (4) (B) (iv). Evidence supports the juvenile court's finding that the father's actions were the cause of the deprivation, namely the evidence that he had sexually abused J. W. C., Z. L. C., and P. C. (P. I. R. M.). With regard to the youngest child, D. T. C., lack of proper care may be established by showing past egregious conduct of the parent toward another child of a sexually abusive nature. See OCGA § 15-11-94 (b) (4) (B) (iv).

(c) The cause of the deprivation is likely to continue. "[T]he trial court is entitled to consider evidence of the [parents'] past actions in determining whether the deprivation is likely to continue." *In the Interest of A. M.*, supra, 259 Ga. App. at 542.

Here, there was evidence that the father physically abused his children. A DFACS caseworker testified about the bruises on J. W. C.'s arm, legs, and back, the bruises on Z. L. C.'s back, buttocks, hand, and legs, the bruises on D. T. C.'s arm, buttocks, back, and legs, and the bruises on P. I. R. M.'s leg and thigh. The older children said that the injuries were caused by the mother and father. Moreover, there was

also evidence that the father had sexually abused three of his four children. The father also had not paid any child support for the children or provided for any of their needs while they were in DFACS custody pursuant to OCGA § 15-11-94 (b) (4). Additionally, at the time of the termination hearing, the criminal charges for child cruelty and aggravated assault were still pending. This evidence, coupled with the evidence of past deprivation, authorized the juvenile court's finding that the deprivation of all four children would likely continue should the child be returned to the father's custody.

(d) Continued deprivation is likely to cause serious harm to the child. "[I]t is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child." *In the Interest of J. T. W.*, 270 Ga. App. 26, 37 (2) (d) (606 SE2d 59) (2004). In this case, however, it is obvious that continued sexual abuse to any of the children will cause harm to all of them. Several doctors testified about the multitude of detrimental effects the physical and sexual abuse had on the children. Moreover, the court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. *In the Interest of P. O. M.*, 255 Ga. App. 534, 536 (3) (566 SE2d 334) (2002).

3. Finally, the record supports the finding that the termination of the father's parental rights is in the best interests of the children. "The determination as to the children's best interests must be made after considering the [children's] physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home." (Citations and punctuation omitted.) *In the Interest of C. A.*, 278 Ga. App. 93, 96 (2) (628 SE2d 151) (2006). A juvenile court has broad discretion in determining how the interests of the children are best served. *In the Interest of M. C.*, 243 Ga. App. 707, 712 (2) (534 SE2d 442) (2000). "The same factors that show the existence of parental misconduct or inability may also support [a] juvenile court's finding that terminating the parent's rights would be in the [children's] best interest." (Citation omitted.) *In the Interest of D. L.*, 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004).

Here, the uncontroverted evidence shows that all four of the children have experienced physical abuse, and three of them were sexually abused by their father. Moreover, there was evidence that several of the children have special needs as a result of the abuse, and the juvenile court is authorized to consider these special needs and the parent's inability to provide for the needs when making a best interest determination. The children have been in foster care for over one year, and P. I. R. M. and D. T. C. are with foster parents who are interested in adopting them. "[T]he juvenile court was authorized to

consider the children's need for a stable home situation and the detrimental effects of prolonged foster care. [Cit.]" *In the Interest of M. L.*, 227 Ga. App. 114, 117 (2) (488 SE2d 702) (1997). Given the father's egregious sexual conduct toward his children, there is no reason to believe that the father can provide, in the near future, a safe and stable home for his children. The children should not have to wait in limbo for the father to become an able parent, if this is even possible. We find no error in the trial court's conclusion that termination is in the children's best interests.

*Judgment affirmed. Andrews, P. J., and Bernes, J., concur.*

DECIDED MARCH 23, 2007.

*Rodney Q. Quarles*, for appellant (case no. A06A1961).

*Meron Dagnew, Bentley C. Adams III*, for appellant (case no. A06A1962).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Cynthia N. Johnson*, for appellee.