651 S.E.2d 123 (2007)
In the Interest of N.S.E. et al., children.
No. A07A1662.
Court of Appeals of Georgia.
August 9, 2007.
*124 Franklin & Hubbard, Curtis L. Hubbard, Jr., Atlanta, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, P. Brian Campbell, Elizabeth M. Williamson, Assistant Attorneys General, for appellee.
BERNES, Judge.
The mother of N.S.E. and G.A.E. appeals the juvenile court's order terminating her parental rights. The mother challenges the sufficiency of the evidence supporting the termination of her parental rights and contends the juvenile court erred by not placing the children with a relative. For the reasons discussed below, we affirm.
In considering the mother's appeal, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the mother's right to custody should have been terminated. We neither weigh the evidence nor determine the credibility of any witnesses, but instead defer to the juvenile court's findings of fact.
(Citation omitted.) In the Interest of K.N., 272 Ga.App. 45, 611 S.E.2d 713 (2005).
So viewed, the record shows that in the spring of 2004, the mother lived with her husband and their three minor children N.S.E., G.A.E., and E.E. in an apartment in DeKalb County. N.S.E. was two years old, G.A.E. was one year old, and E.E. was four months old. In the early morning of April 27, 2004, the mother called 911 because E.E. was unconscious and bleeding from the nose. The parents' efforts at CPR, which they had attempted by themselves for four hours, had been unsuccessful in reviving the infant.
Upon arriving at the scene, emergency medical personnel found E.E. nonresponsive with injuries to his chest area and immediately transported him to the hospital emergency department. A detective who arrived at the scene shortly thereafter observed that N.S.E. and G.A.E. had marks on them accompanied with bruising and redness. Like E.E., they were taken to the emergency department for evaluation.
E.E. died shortly after arriving at the hospital. Observations made by a forensic pediatrician prior to E.E.'s death and in a subsequent autopsy revealed that E.E. exhibited bleeding in the upper inner eyelids; missing skin layers on the chest area; looped cord marks on his chest, back, and buttocks indicative of a looped object striking the infant; and parallel lines on the infant's left side suggestive of an un-looped cord injury. X-rays *125 showed that E.E. had a total of fifteen separate broken bones in various stages of healing, including nine broken ribs and fractures in the left foot, left hand, and thigh bone. Finally, a CAT scan and the autopsy showed that E.E. had suffered an intercranial trauma which resulted in internal contusions to the scalp and brain, brain swelling, and internal hemorrhaging. The forensic pediatrician and medical examiner who performed the autopsy concluded that these injuries were nonaccidental and resulted from severe physical abuse occurring over a period of time. The medical examiner further concluded that the cause of E.E.'s death was homicide resulting from blunt force applied to the infant's head.
The forensic pediatrician also had an opportunity to examine N.S.E. and G.A.E. while they were in the emergency department. N.S.E. had old and new bruises and pattern markings on her chest, abdomen, back, and right cheek reflecting that she had been beaten with a belt and looped cord object on more than one occasion. Similarly, G.A.E. had a mark on his right cheek indicative of physical abuse.
N.S.E. and G.A.E. were placed in the immediate protective custody of the DeKalb County Department of Family and Children's Services ("DFCS"). DFCS subsequently filed its deprivation petition regarding N.S.E. and G.A.E., and the juvenile court conducted a hearing on the matter. At the time of the hearing, the father was incarcerated and had been charged with murder and other child cruelty crimes for the death of E.E. and the abuse perpetrated upon the two surviving children. The mother had been charged on three counts of deprivation of a minor for the abuse of the three children. Following the hearing, the juvenile court adjudicated N.S.E. and G.A.E. deprived and awarded temporary custody to DFCS, finding that the two children, along with E.E., had been subject to severe, ongoing physical abuse while in the custody and control of their parents.
DFCS developed a nonreunification case plan for N.S.E. and G.A.E. with adoption as the goal, which the juvenile court adopted as the permanent plan for the children. DFCS then filed its petition to terminate the parental rights of the mother and father based on the allegations of physical abuse. The juvenile court conducted an evidentiary hearing over several days to address the petition.
At the hearing, the forensic pediatrician and medical examiner testified about their observations and opinions concerning the children as set out above. The father and mother also testified. The father admitted that he had disciplined all three children by spanking them with objects or slapping them, resulting in bruises and marks on their bodies. According to the father, his mode of discipline was required by his religious beliefs, and he asserted that "[a]ny sound spanking will leave a mark." The father further admitted that he began spanking E.E. at least one month prior to his death; that he had previously broken E.E.'s femur due to slapping him; and that on the day when E.E. was taken to the hospital, he had spanked and slapped E.E., who he believed had exhibited "stubbornness." Finally, the father testified that he was in charge of discipline, but that on one occasion a few days before E.E.'s death, the mother had assisted him in spanking N.S.E. and G.A.E. with belts, leading to bruises and marks on their chests and backs.
The mother testified that she was aware of the severe discipline inflicted upon the children from their infancy by their father and the injuries they had sustained as a result. Despite the fact that she saw the bruises and other injuries on her children caused by the father, she never took any of the children to a doctor. Additionally, the mother testified that based on the instruction of the father, she had waited to call 911 and had assisted in performing CPR for four hours on E.E. after he had lost consciousness and stopped breathing. While the mother asserted that she did not condone the severe disciplinary methods of the father and had confronted him on numerous occasions about the issue, she stated that she was afraid of the father and felt powerless to stop him because he also had physically abused and threatened her. Nevertheless, despite her alleged concern over the father's methods, the mother had physically assaulted the maternal grandmother when the latter attempted to intervene *126 in the father's discipline of the children and had also told her family not to get involved when they voiced their concerns to her. Moreover, the mother conceded that she herself had spanked N.S.E. and G.A.E. with belts on one occasion at the behest of the father.
The mother went on to testify that even though she had been helpless to stop the father, she was determined to break the cycle of abuse and wanted to regain custody of N.S.E. and G.A.E. The mother pointed out that she had divorced the father, had attended a six-week parenting course, and was currently participating in a support group for battered women. In an effort to explain why she did not seek to end the abuse or obtain help for her children, the mother called an expert clinical psychologist, who testified that the mother exhibited patterns of behavior consistent with a battered spouse, suffered from cognitive distortions, and had dependant personality disorder, all of which combined to create a situation of learned helplessness. He further opined that as a result of the abuse she had witnessed and experienced, the mother had symptoms of post-traumatic stress disorder.
In rebuttal, DFCS presented the testimony of its own expert clinical psychologist that several of the mother's actions were atypical of one who is suffering from the learned helplessness associated with being a battered spouse. For example, the mother worked outside of the home, which was not typical of a wife suffering from learned helplessness caused by abuse. The fact that the mother had confronted the father about his disciplinary methods also was inconsistent with learned helplessness. Additionally, the psychologist testified that the mother would need long-term, intensive psychotherapy and family counseling before she could ever be trusted again with her children, and that without such therapy there was a high risk of the mother living again with an abusive partner.
The case managers of N.S.E. and G.A.E. testified at the hearing as well. They noted that when the children came into care, they were emotionally fragile and engaged in combative behavior. N.S.E. and G.A.E. also were observed engaging in "silent" crying, where they would cry but place their hands over their mouths to avoid making noise, which their mother had taught them to do in order to avoid being hit by their father. The case managers further testified that although the children have had supervised visits with their mother since coming into care, they are afraid of her and have resisted having any contact or interaction with her unless bribed with toys and candy. In contrast, N.S.E. and G.A.E. have developed strong attachments to their current foster parents, who wish to adopt them.
Following the hearing, the juvenile court granted the termination petition and awarded permanent legal custody of N.S.E. and G.A.E. to DFCS for the purpose of adoption. This appeal ensued.
1. The mother contends that the juvenile court erred in finding that there was sufficient evidence to terminate her parental rights.
The Georgia Code sets forth a two-step process to be used in termination of parental rights cases. First, the trial court determines "whether there is present clear and convincing evidence of parental misconduct or inability." OCGA § 15-11-94(a). Four factors must be present to establish parental misconduct or inability: (1) the child must be deprived; (2) the lack of proper parental care or control by the parent in question must cause the deprivation; (3) the cause of the deprivation must be likely to continue; and (4) continued deprivation must be likely to cause the child serious physical, mental, emotional, or moral harm. OCGA § 15-11-94(b)(4)(A)(i)-(iv). If the trial court finds that these four factors exist, then the court determines whether termination of parental rights is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child, . . . including the need for a secure and stable home." OCGA § 15-11-94(a).
In the Interest of C.M., 275 Ga.App. 719, 720, 621 S.E.2d 815 (2005).
*127 Here, the mother challenges only two components of the test for terminating parental rights. First, she contends that it was the lack of proper parental care or control of the father, not her, that caused the deprivation of N.S.E. and G.A.E. Second, she contends that there was insufficient evidence that the cause of the children's deprivation was likely to continue. We will address these two contentions separately.
(a) The mother's contention that there was insufficient evidence that she caused the children's deprivation is without merit. The record reflects that N.S.E. and G.A.E. were subject to severe beatings while in the care of the mother. "Even if the mother did not cause the injuries, the juvenile court was authorized to conclude that the injuries were attributable to her inability to protect her child[ren], which . . . constitutes lack of proper parental care and control." (Footnote omitted.) In the Interest of V.M.T., 243 Ga.App. 732, 736(3), 534 S.E.2d 452 (2000). See also In the Interest of K.J.M., 282 Ga.App. 72, 75(2)(b), 637 S.E.2d 810 (2006); In the Interest of A.M., 259 Ga.App. 537, 541-542, 578 S.E.2d 226 (2003); In the Interest of M.V., 253 Ga.App. 669, 671-672, 560 S.E.2d 125 (2002). Furthermore, the juvenile court was entitled to consider the mother's failure to take any steps to prevent the father from beating E.E. and causing the infant's death, as evidence that N.S.E. and G.A.E. were also deprived due to her lack of proper parental care and control. See In the Interest of K.J.M., 282 Ga.App. at 75(2)(b), 637 S.E.2d 810. Lastly, the mother was not merely passive. As noted above, the record reflects that the mother severely spanked N.S.E. and G.A.E. on at least one occasion, assaulted her own mother when she attempted to prevent the father from beating the children, and told her extended family not to get involved when they voiced concerns about the children.
It is true that the mother's expert clinical psychologist testified that as a result of being battered, the mother suffered from a learned helplessness that prevented her from taking action against the father. But, as previously pointed out, the expert clinical psychologist called by DFCS testified that a theory of learned helplessness was inconsistent with many of the facts in this case. The juvenile court, as the trier of fact, was entitled to credit the testimony of the expert called by DFCS and reject the testimony of the mother's expert. See Hill v. Centennial/Ashton Properties Corp., 254 Ga.App. 176, 178(4), 561 S.E.2d 853 (2002). Moreover, even if the mother was suffering from learned helplessness caused by being battered, it would not change nor excuse the fact that her passivity was at least partially the cause of the children's deprivation under her care. See In the Interest of A.M., 259 Ga.App. at 542, 578 S.E.2d 226 (noting that "the mother's passivity in response to [the abuse] renders her culpable as well").
For these reasons, the juvenile court was authorized to find that there was clear and convincing evidence that the mother's lack of proper parental care and control caused the deprivation of N.S.E. and G.A.E.
(b) The mother's contention that there was insufficient evidence that the cause of the children's deprivation was likely to continue is likewise without merit. First,
[the juvenile] court was permitted to consider the mother's past conduct in determining that the deprivation would likely continue, including demonstrating passivity in the face of deadly child abuse. The court was not required to return the children to the mother's custody to suffer further physical abuse.
(Citations and punctuation omitted.) In the Interest of J.B.M., 284 Ga.App. 480, 485(1), 644 S.E.2d 317 (2007). Thus, evidence that the mother failed to take steps to prevent the father's abuse of N.S.E. and G.A.E., as well as her active assistance in spanking the children with belts on at least one occasion and preventing her family from helping, counseled in favor of the juvenile court's finding that the deprivation was likely to continue. See id. See also In the Interest of K.J.M., 282 Ga.App. at 75-76(2)(c), 637 S.E.2d 810; In the Interest of A.M., 259 Ga.App. at 542, 578 S.E.2d 226; In the Interest of M.V., 253 Ga.App. at 672, 560 S.E.2d 125 (2002).
Second, as previously indicated, the clinical psychologist called by DFCS opined that the *128 mother would need intensive psychotherapy and family counseling over an extended period of time to address and confront what occurred in her household and that, otherwise, there was a high risk of her living again with an abusive spouse. And, while the mother emphasizes that she attended a six-week parenting course and is participating in a support group for battered women, these are a far cry from the type of intensive one-on-one therapy seen as a necessity by the psychologist. As such, the mother "has failed to take measures to remedy the problems which . . . contributed to [the children's] injuries," and the juvenile court also was entitled to weigh this in favor of finding that the deprivation was likely to continue. In the Interest of K.J.M., 282 Ga.App. at 76(2)(c), 637 S.E.2d 810.
Third, the more recent case manager of N.S.E. and G.A.E. testified that both children have special needs as a result of the severe abuse they sustained, rendering them extremely fragile emotionally. Needless to say, a mother who has permitted her children to be repeatedly beaten from infancy, resulting in the death of one of those children, lacks the fundamental skills necessary for parenting children who have special needs like N.S.E. and G.A.E. This too supported the juvenile court's finding concerning the likelihood of continued deprivation. See In the Interest of V.M.T., 243 Ga.App. at 736(3), 534 S.E.2d 452.
Fourth and finally, the record reflects that there currently is no parent-child bond between the mother and N.S.E. and G.A.E., but rather that the children fear their mother and will interact with her only when coaxed with candy or other items. The lack of such a bond further militates in favor of the finding of continued deprivation. See In the Interest of L.G., 273 Ga.App. 468, 474(2)(c), 615 S.E.2d 551 (2005).
Under these combined circumstances, the juvenile court was entitled to find that there was clear and convincing evidence that the deprivation of N.S.E. and G.A.E. was likely to continue. The mother thus has failed to point to any basis for reversing the juvenile court's grant of the termination petition.
2. The mother next argues that even if the grant of the termination petition was appropriate, the juvenile court erred by awarding permanent custody of N.S.E. and G.A.E. to DFCS for purposes of adoption without adequately considering whether the children should be placed with the maternal grandmother or the maternal great aunt. We are unpersuaded.
Under OCGA § 15-11-103(a)(1),
[i]f, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child, if the court determines such placement is the most appropriate for and in the best interest of the child. . . .
"Inasmuch as there is no conclusive preference given to relatives, the juvenile court is afforded wide discretion to determine whether a child should be placed with a relative or kept in a stable foster home." (Citation and punctuation omitted.) In the Interest of K.W., 283 Ga.App. 398, 402-403(2), 641 S.E.2d 598 (2007).
We find no abuse of discretion by the juvenile court. During the termination hearing, one of the case managers testified that the maternal grandmother was considered as a possible placement for N.S.E. and G.A.E. but was ultimately rejected based on concerns that she knew about the abuse but had done nothing to effectively stop it. In this regard, the record reflects that the mother, father, and the children lived with the maternal grandmother for approximately one year, and that the grandmother had seen bruising on the children and had witnessed the father spanking G.A.E., who was six months old at the time. Although she initially called the police department after witnessing the spanking, the grandmother ultimately failed to follow through with the police or take any other steps to prevent the ongoing abuse. Given the fact that the maternal grandmother *129 knew of the abuse going on in her own home but took inadequate steps to prevent it, the juvenile court acted within its discretion in declining to place the children with the maternal grandmother. See In the Interest of B.W., 254 Ga.App. 63, 65-66(3), 561 S.E.2d 199 (2002).
Similarly, the case manager testified that DFCS initially explored the possibility of placing N.S.E. and G.A.E. with the maternal great aunt, but the aunt lived abroad in Spain and did not know the children. In contrast, there was evidence that the children were strongly bonded with their foster parents who wish to adopt them. In light of the maternal aunt's lack of a bond with the children and the foster parents' strong bond with them, the juvenile court was authorized to decline placing the children with the aunt. See In the Interest of K.W., 283 Ga.App. at 403(2), 641 S.E.2d 598; In the Interest of A.L.S.S., 264 Ga.App. 318, 326(2), 590 S.E.2d 763 (2003).
Judgment affirmed.
BLACKBURN, P.J., and RUFFIN, J., concur.